**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| MATTHEW WOMACK, M.D. ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| v. ) | FILE NO.: 1:25-cv-02250 - SEG |
| ) | |
| MEDICAL SECURITY ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION
TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

## I.     INTRODUCTION

Medical Security Insurance Company seeks to evade liability for the catastrophic consequences of its own bad-faith gamble. Before MSIC received the *Brightman* Demand, MSIC knew Dr. Matthew Womack faced a substantial likelihood of a verdict in excess of his policy limits. Under Georgia law, a prudent insurer "would have done everything within its control to accept the plaintiff's offer and thus protect its policyholder from an excess verdict." *Cotton States v. Brightman*, 276 Ga. 683, 686 (2003). Rather than inform Dr. Womack of his risk, MSIC undertook the duty to exclusively handle the demand. MSIC decided on its own to reject the demand and roll the dice at trial. The loser of MSIC's gamble was Dr. Womack, who now has a $45 million judgment against him.

MSIC now argues it had no duty to settle because the demand made against Dr. Womack and his practice group, North Fulton Emergency Physicians, LLC ("NFEP"), another MSIC insured, was for $2 million, which exceeded Dr. Womack's own limit of $1 million. MSIC ignores that Dr. Womack and NFEP were both defendants, both were MSIC insureds and both had $1 million in coverage for a total of $2 million. The demand was for the policy limits.

Further, MSIC misconstrues Georgia law, which still requires insurers to reasonably respond to settlement offers. An insurer that knows its insured is likely to get hammered with an excess judgment and who receives and takes exclusive control over whether and how to respond to a time-limited demand has a duty to respond reasonably. That duty is not controlled solely by the wording the plaintiff chooses to use in the demand. Because the pleadings and the documents central to this dispute establish that MSIC owed a duty that it breached, this Court should deny MSIC's Motion for Judgment on the Pleadings.

## II.   STATEMENT OF FACTS

### A.   A Catastrophic Injury Results in a Lawsuit.

On October 26, 2015, Jonathan Buckelew was brought to the emergency room and seen by Dr. Womack. (Doc. 1-1, ¶6). Buckelew was later determined to have suffered a massive stroke, resulting in "locked-in syndrome," meaning he is conscious but suffers total body paralysis. (Doc. 1-1, ¶7). Counsel for the

Buckelew family, including Laura Shamp, filed the "Underlying Lawsuit" against numerous defendants, including Dr. Womack and his practice group, NFEP, alleging medical negligence. (Doc. 1-1, ¶15; Doc. 11-2).

**B.**    **MSIC Takes Over the Defense of the Underlying Lawsuit, and Dr. Womack Asks MSIC to Get the Case Settled.**

MSIC insured Dr. Womack under a professional liability "Policy." (Doc. 1-1, p. 3; Doc. 11-1). The "Policy" provides Dr. Womack with limits of $1 million per claim. (Doc. 1-1, ¶¶8-9; Doc. 11-1, p. 17) The Policy provides an additional $1 million to the practice group, NFEP, which was a codefendant. (Doc. 11-1, p. 61)

MSIC admits it has a duty to "professionally evaluate" claims against Dr. Womack. (Compare Doc 1-1, ¶14 with Doc 20, ¶14)[1] Indeed, the Policy expressly states MSIC may "make such investigation of any … claim … as it deems appropriate." (Doc 11-1, p. 26) MSIC's duty to evaluate is not in question, because MSIC did in fact perform its own evaluations of the claim separate and apart from defense counsel's evaluations. (E.g., Exhibit A and Exhibit D)

MSIC chose which lawyers would defend Dr. Womack and the practice group. (Doc 1-1, ¶17) MSIC retained Beth Kanik to defend Dr. Womack and NFEP. MSIC adjustors kept tabs on the lawyers, receiving analysis from them

---

[1] FRCP 8(b)(6). MSIC denied parts of the allegation, but MSIC did not deny it had a duty to professionally evaluate the claim.

regarding Dr. Womack's risk of liability – not all of which was not with Dr.

Womack – and providing their own analysis. (E.g., Exhibit A and Exhibit D)

As the Underlying Lawsuit progressed, and despite being kept in the dark by

MSIC, Dr. Womack became concerned about his exposure. On August 5, 2018, he

sent an email directly to MSIC's Southeast Claims Analyst, Mike Tamucci, stating:

> From what I've heard I don't know how successful this would be, but
> at this point **I would like for you to try and settle this case on my
> behalf.**

(Exhibit C, p. 2, emphasis added) MSIC's Tamucci, responded with MSIC's

"professional evaluation" of the claim, telling Dr. Womack, "we [MSIC] think your

treatment of the patient was within the standard of care." (Exhibit C, p. 1) MSIC's

report to Dr. Womack on its professional evaluation of the claim further noted,

"The primary hurdle in the case" was conflicting testimony between two other

providers. (Exhibit C, p. 1)

MSIC's evaluation in Tamucci's email to Dr. Womack differs remarkably

from a report defense counsel Kanik had sent to Tamucci two months earlier.

(Exhibit B) First, Kanick's report stated Dr. Womack had a 40 percent chance of

winning, meaning he had a 60 percent chance of losing. (Exhibit B, pp. 2 and 18)

Kanik's report predicted a "likely adverse jury verdict range" of $10 million to $12

million and plainly acknowledged the potential for a "verdict in excess of insureds'

policy limits." (Exhibit B, p. 18) The prediction of a likely verdict in excess of

policy limits referred to insureds in the plural, meaning it predicted a verdict in excess of Dr. Womack's and NFEP's combined limits of $2 million.

Second, contrary to Tamucci's evaluation that "the primary hurdle" for the defense was conflicting testimony between two *other* providers, Kanik's report identified the primary hurdle as a "swearing match between Dr. Womack and the consulting neurologist." (Exhibit B, p. 2) Kanik's report repeatedly referred to the disputed testimony and its potential for driving up Dr. Womack's percentage of fault. (Exhibit B, p. 3-4) "Candidly, **the issue** is whether we can remove the focus from the Futrell/Womack dispute." (Exhibit B, p. 5, emphasis added) It is never a good thing when Defendants are pointing the finger of fault at each other. MSIC's email to Dr. Womack painted a far rosier picture than Kanik's report to MSIC.

With knowledge that Dr. Womack faced a substantial likelihood of an excess judgment, and in response to Dr. Womack's request to at least "try" to settle, MSIC kept Dr. Womack in the dark and mollified his concerns. (Exhibit B) Moreover, MSIC expressly told Dr. Womack that MSIC would decide when to try to settle on his behalf: "We will continue to work to build your defense, while being mindful of this testimony and **the ultimate case direction – defense or settlement** of the lawsuit." (Exhibit B, p. 1, emphasis added) Thus, MSIC undertook the duty to decide when to settle on Dr. Womack's behalf and what risks to take with Dr. Womack's financial wellbeing.

In response to Dr. Womack's request to "try and settle", MSIC did nothing to try and settle. Nothing at all. (Doc 1-1, ¶21)

### C.    The *Brightman* Demand.

More than nine months after Dr. Womack asked MSIC to try to settle, Mr. Buckelew sent a time-limited global settlement demand dated May 17, 2019. (Exhibit E, p. 2)[2] The *Brightman* Demand apportioned amounts sought from each defendant, offering to settle with Dr. Womack and NFEP for their limits of $2 million. (Exhibit E, p. 2) In explaining why there would be a verdict for the plaintiff, the *Brightman* Demand spent more words and space on Dr. Womack than on any other defendant:

> Dr. Womack then failed to recognize a developing stroke, despite testifying that he knew of the well-established association between chiropractic neck manipulation and vertebral artery dissection and stroke, and despite the fact that Jon was exhibiting classic signs of a posterior circulation stroke and locked in syndrome while still in the ER. Dr. Womack testified that although Jon was alert and looking around the room, he was unable to move his extremities other than his right hand. And, of course, Dr. Womack lied under oath regarding whether he changed his note on the 27th.

(Exhibit E, p. 3) The *Brightman* Demand expired June 17. (Exhibit E, p. 3)

As to damages, the *Brightman* Demand substantiated $6 million in past medical expenses and documented future medical expenses (a life-care plan)

---

[2] The *Brightman* Demand is an exhibit to the complaint. (Doc 11-3) The version attached to this brief includes the exhibits to the *Brightman* Demand, which are central to Dr. Womack's claims.

ranging from $15-$36 million. (Exhibit E, p. 4 and Attachments) The *Brightman* Demand further explained that damages for pain and suffering would greatly exceed special damages. (Exhibit E, p. 4)

The *Brightman* Demand included the following:

**THIS IS A TIME-LIMITED OFFER OF COMPROMISE. AT 5:00 P.M. EST ON JUNE 17, 2019, THIS OFFER WILL BE WITHDRAWN BY ITS TERMS. SHOULD PLAINTIFFS OBTAIN AN EXCESS JUDGMENT AGAINST ANY OF THE DEFENDANTS NAMED ABOVE, IT WILL IN TURN, PROVIDE SAID DEFENDANTS WITH CLAIMS FOR BAD FAITH AGAINST THEIR INSURANCE CARRIERS PURSUANT TO *SOUTHERN GENERAL INS. CO. V. HOLT*, 262 Ga. 267, 416 S.E.2d 274 (1992).**

(Exhibit E, p. 4, emphasis in original)

For the purposes of this motion, the *Brightman* Demand provided a valid and reasonable opportunity to settle within policy limits. (Doc 1-1, ¶26) MSIC could have offered Dr. Womack's limits and tried to get the claims against him settled. (Doc 1-1, ¶¶27-28) MSIC had control over whether to offer Dr. Womack's limits but failed to exercise that control to attempt settlement. (Doc 1-1, ¶29) Had MSIC attempted to settle in response to the *Brightman* Demand, the claims against Dr. Womack would have more likely than not settled. (Doc 1-1, ¶32) MSIC's failure to attempt settlement, caused the Underlying Lawsuit to go to trial. (Doc 1-1, ¶33)

**D.**     **While the Demand is Pending, MSIC's Chosen Defense Counsel Reports to MSIC that the Chance of an Excess Verdict Has Increased.**

On June 6, 2019, while the demand was pending, MSIC learned that the risk of an excess verdict was growing. (Exhibit F) Compared to the previous report, the new report maintained the 60 percent chance of an excess verdict but increased the projected verdict range by millions to $12-$15 million. (Exhibit F, p. 1 and p. 21) While the previous report estimated Dr. Womack's apportion of fault at 10 percent, the new report warned Dr. Womack would likely share 40 percent of fault among him and two other providers. (Exhibit F, pp.1-2) Thus, the report plainly predicted Dr. Womack and two others likely being responsible for $6 million (40 percent of $15 million), with Dr. Womack's one-third share being $2 million. Even if the if the lowest verdict in the projected range were to occur, the verdict against Dr. Womack was projected at $1,600,000 ($12 million x 40 percent ÷ 3), which would exceed his own Policy limits and cause him personal financial harm.[3]

Dangerously, the report noted that in the "swearing match" between Dr. Womack and another provider, it was discovered Dr. Womack had entered key notes *after* he learned of Mr. Buckelew's adverse result, requiring an errata sheet

---

[3] Construing the facts of the Underlying Lawsuit as set forth in Exhibit F and the *Brightman* Demand in the light most favorable to Dr. Womack's position. The verdict range of $12-$15 million was spectacularly low given the costs of lifetime care for a person with locked-in syndrome and the pain and suffering likely to be awarded for such a grisly condition. An excess verdict was a near certainty.

and allowing plaintiffs to argue Dr. Womack was lying. (Exhibit F, p. 3)

Kanik's report indicated little likelihood that additional information would be discovered to make the situation any better: "Discovery and expert depositions have been completed." (Exhibit F, p. 12) Kanik recommended no additional research. (Exhibit F, p. 12) Thirty-two depositions had been taken and reported to MSIC. (Exhibit F, pp. 18-19) The report advised MSIC the venue was plaintiff-friendly. (Exhibit F, p. 8) MSIC was fully aware of the catastrophic exposure Dr. Womack faced if the case did not settle.

### E.   MSIC Undertakes Analyzing, Responding to and Otherwise Handling the *Brightman* Demand.

Dr. Womack received the *Brightman* Demand (Exhibit F, p. 1), but it was without comment and without the analysis MSIC received and itself conducted. Dr. Womack's knowledge of precisely what MSIC did upon receiving the *Brightman* Demand is incomplete without further discovery in this action. According to documents he has obtained and attached to this brief, it is clear that MSIC considered, took control over and itself rejected the *Brightman* Demand.

MSIC also received the *Brightman* Demand on May 17. (Exhibit F, p. 1) While the demand was pending, Kanik asked Shamp "for additional information for purposes of evaluating your demand." (Exhibit G, p. 1) Kanik was seeking the information on behalf of MSIC, as its claim professionals were blind copied.

(Exhibit G, p. 3)[4] Shamp's response extended the deadline for MSIC to respond to the *Brightman* Demand to June 28 and reminded MSIC of the bad-faith exposure that would follow a rejection of the *Brightman* Demand. (Exhibit H) Shamp tried hard to settle the case for her client. But MSIC would not allow such a resolution by using their own money as promised under the insurance policy.

Kanik then asked MSIC adjustors what to do: "Ladies, How do you want us to respond to Ms. Shamp?" (Exhibit I) Presumably phone calls followed, because the next communication among the adjustors (or at least the next one Dr. Womack possesses) is a draft rejection letter Kanik sent to MSIC for approval. (Exhibit J) MSIC rejected Kanik's draft, and two MSIC claim professionals conferred among themselves and drafted a rejection. (Exhibit K) The rejection letter MSIC claim professionals drafted went out on June 28, 2019. (Exhibit L) Thus, upon receiving the *Brightman* Demand, MSIC gathered additional information to evaluate it, actually did evaluate it, received Kanik's evaluation of the substantial likelihood of an excess judgment, decided to respond, and drafted the response.

Although MSIC rejected the *Brightman* Demand, MSIC did not reject settlement. Instead, MSIC indicated it wanted to negotiate at mediation in good faith. (Exhibit L) MSIC acknowledged it had a duty to try to settle, it just wanted to settle for less than policy limits.

---

[4] Shirley Pruitt evidently took over handling of the claim from Tamucci.

**F.      MSIC Belatedly Tenders its $2 Million Limits on Behalf of Dr. Womack and NFEP.**

On December 2, 2021, MSIC "tendered $2,000,000 on behalf of North Fulton Emergency Physicians, LLC and Dr. Matthew Womack in full resolution in this matter." (Exhibit M) This offer, made too late to protect Dr. Womack, confirms that MSIC all along had the ability and control to do what it could to settle in response to the *Brightman* Demand. There is no reason MSIC could not have sent the same letter in response to the *Brightman* Demand.

**G.      The Excess Verdict.**

The case proceeded to trial with a predictable and devastating result for Dr. Womack. The jury returned a verdict finding Buckelew's total damages to be $75,000,000 and apportioning 60 percent of the fault to Dr. Womack. (Doc. 11-4) Consistent with plaintiff's predictions in the *Brightman* Demand, the jury awarded $9 million for past medical expenses, $20 million for future medical expenses and $46 million for pain and suffering. (Compare Doc 11-4 with Exhibit E) Because MSIC unilaterally decided not to settle for policy limits when it had an extended opportunity to do so, Dr. Womack is personally liable for $45 million, plus post-judgment that accrues at approximately $12,387 each day. (Doc 1-1, ¶37)

III.   ARGUMENT AND CITATION OF AUTHORITY

A.   **This Court Should Consider Documents "Central" to Dr. Womack's Claims and View them in the Light Most Favorable to Dr. Womack.**

"[W]hen resolving a motion to dismiss or a motion for judgment on the pleadings, a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). *Johnson* rejected the argument that a document must be referred to in a complaint for the document to be attached to a brief and for the court to consider it. *Id*.

The liberalizing rule in *Johnson* is relevant here, as multiple documents are "central to the plaintiff's claims" though they were not attached to or referred to in the complaint. One reason they were not is that they contained mental impressions of the Underlying Lawsuit. (E.g., Exhibit B and Exhibit F) At the time Dr. Womack filed the instant complaint, the judgment had been affirmed by the Court of Appeals and was before the Supreme Court of Georgia on a petition for certiorari. Although the writing was on the wall, and it was obvious the petition would be rejected, it was necessary for counsel to refrain from attaching work product to the complaint. Now, however, is the appropriate time for this Court to see claims handling documents – which are central to Dr. Womack's claims against MSIC –

12

and learn how obvious it was that Dr. Womack faced excess liability, how MSIC took control of the *Brightman* Demand, and why an insurer like MSIC has a duty to do "what it can to effectuate [] settlement" upon receipt of a demand like the one here. *Cotton States v. Brightman*, 276 Ga. 683, 686 (2003).

"Judgment on the pleadings is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Johnson*, 107 F.4th at 1292. In addition, this Court must "accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff." *Id*. "Judgment on the pleadings is appropriate only when the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002).

Accepting the allegations in the complaint as true, and viewing the documents central to the claims in the light most favorable to Dr. Womack, this Court should deny MSIC's Motion for Judgment on the Pleadings.

**B.**     ***Brightman* Imposed a Duty on MSIC to Do What it Could to Protect its Insured.**

     1.     This case is substantially similar to *Brightman*.

"[A]n insurance company faced with a demand involving multiple insurers can create a safe harbor from liability for an insured's bad faith claim under *Holt* **by meeting the portion of the demand over which it has control, thus doing what it can to effectuate the settlement of the claims against its insured**."

*Cotton States v. Brightman*, 276 Ga. 683, 686 (2003) (emphasis added). "[A]n insurer's duty to settle also arises from and is included within the covenant of good faith and fair dealing implied in every insurance contract." *GEICO Indemnity Company v. Whiteside*, 311 Ga. 346, 351 (2021).

*Brightman* involved a single demand to multiple insurers. The demand was contingent on all insurers accepting. One insurer accepted; one did not. The case went to trial and resulted in a judgment in excess of policy limits. The insurer that did not accept was sued for negligently failing to settle. The jury found the insurer failed to reasonably respond to the demand. On appeal, the insurer argued it had no duty to respond to the demand, as it included conditions – other insurers accepting – over which it had no control. The Supreme Court of Georgia rejected the defense, ruling that an insurer must meet "the portion of the demand over which it has control" and "do[] what it can to effectuate the settlement." 276 Ga. at 686.

This case, like *Brightman*, involves a single demand to multiple insurers that was contingent on all insurers accepting. Like the insurer in *Brightman*, MSIC rejected the demand. The case went to trial and resulted in a judgment in excess of Dr. Womack's policy limits. This case is just like *Brightman*, and a jury must determine whether MSIC failed to act as an ordinarily prudent insurer.

Applying *Brightman* in this case advances the public policy goals expressly stated by the Supreme Court of Georgia. Those policy goals were to "protect the

14

financial interests of policyholders in cases where continued litigation would expose them to a judgment exceeding their policy limits while protecting insurers from bad faith claims when there are conditions involved in the settlement demand over which they have no control." *Id*. at 686.

In this case, MSIC knew very well that continued litigation would expose Dr. Womack to a judgment exceeding his policy limits. (Exhibit F, p. 1 and p. 21) Construing the allegations in favor of Dr. Womack, nothing changed between the projection of an excess verdict and the belated tender, as discovery was over at the time the excess judgment was projected. (Exhibit F, p. 12) MSIC could have and should have tendered its limits and tried to get the claims settled. (Doc 1-1, ¶¶27-28) Alternatively, MSIC could have offered Dr. Womack's limits of $1 million. MSIC had control over whether to offer its policy limits, which we know because MSIC did offer its $2 million on behalf of Dr. Womack and NFEP after the *Brightman* Demand expired. (Exhibit M)

MSIC received a premium to evaluate claims and determine when to settle. Tamucci told Dr. Womack MSIC would determine the right time to try to settle. (Exhibit C) When that time came with delivery of the *Brightman* Demand, MSIC took full control from defense counsel and decided what to do every step of the way. MSIC had a duty to reasonably respond, and the complaint sufficiently

alleges that MSIC's response was negligent or in bad faith. Under *Brightman*, MSIC had a duty to at least try to settle.

Furthermore, the reason MSIC rejected the *Brightman* Demand is not because MSIC thought it had no duty to settle. The rejection expressly states MSIC wanted to negotiate at mediation instead of attempting to meet the conditions of the demand over which it had control. (Exhibit L) Construing the rejection in Dr. Womack's favor, MSIC rejected the *Brightman* Demand because it wanted to go to mediation, bargain with the plaintiff, and try to save some of its limits for its own financial benefit. (Exhibit L) Arguing the absence of a duty to settle is a *post hoc* rationalization. This Court should deny the motion and rule MSIC had a duty to reasonably respond to the *Brightman* Demand and do what it could to protect Dr. Womack and itself.

### 2. The demand was within limits, and MSIC offered $2 million anyway.

Even MSIC must admit there was nothing tricky or difficult about the policy limits demand. Dr. Womack and NFEP are both insureds, and each had $1 million in limits. The demand for $2 million was, in fact, within the available limits. Under *Brightman*, MSIC had a duty to do what was within its control to effectuate settlement. It could have responded by tendering $2 million or even Dr. Womack's $1 million. MSIC did neither, flatly rejecting the demand while its own analysis

16

screamed that an excess verdict was not just possible, but likely. Whether this Russian roulette was negligence or bad faith is a quintessential jury question.

### 3. Discovery is needed to inform the existence of duties.

The existence of a duty is determined by the court as a matter of law. But courts determine whether there is a duty is based on facts. It follows, therefore, that discovery is necessary to help inform the Court and parties of MSIC's duty. In *Brightman*, for example, whether there was a duty to respond to the demand was not determined in a vacuum on a motion for judgment on the pleadings. Instead, the Supreme Court relied heavily on expert testimony from both sides in deciding what legal duties existed and under what circumstances those legal duties were triggered. *Id*. at 686. *Brightman*'s ruling on duty was decided on a factual record.

In this case, Dr. Womack should be entitled to discovery so as to inform himself and the Court of MSIC's actions during the pendency of the *Brightman* Demand. After all, after Dr. Womack asked MSIC to at least try to settle on his behalf, MSIC gave Dr. Womack a sanitized (if not dishonest) view of his risk and expressly told him MSIC would decide when to try to settle on his behalf. (Exhibit C) The complaint sufficiently alleges that MSIC undertook the duty to decide when to settle and negligently or in bad faith decided not to do what it could to effectuate settlement in response to the *Brightman* Demand.

It is woefully premature to decide duty as a matter of law. In fact and as may be already apparent, once discovery is complete, this Court may well determine that MSIC breached its duties to Dr. Womack as a matter of law.

### C.    The Brightman Demand Complies with *First Acceptance.*

Cases following *Brightman* establish no bright-line rule overturning or contradicting *Brightman's* holding that an insurer must do what it can to effectuate settlement when confronted with a time-limited demand with conditions beyond its control. *E.g.*, *First Acceptance v. Hughes*, 305 Ga. 489 (2019).

The holding in *First Acceptance* – that an insurer's duty to settle arises when the injured party presents a valid offer to settle within the insured's policy limits – arises out of a demand presenting a claim against a single insured, a demand seeking limits from a single insurer and an underlying lawsuit with a single defendant. Nothing in *First Acceptance* overrules the framework established in *Brightman* for handling multi-defendant, contingent settlement demands. Indeed, *First Acceptance* approves *Brightman* by citing favorably to it. 305 Ga. at 492. The Supreme Court cited favorably to *Brightman* again in *Whiteside*. 311 Ga. 354.

To be sure, *First Acceptance* referred to a single insured's limits, but that is because only a single insured and single insurer were involved. Even a cursory review of the facts in *First Acceptance* reveals that the amount of the demand and the amount of available policy limits had nothing to do with what any party argued

18

or what the Supreme Court of Georgia decided. Indeed, although *First Acceptance* found the demand was not "valid", it was because the demand did not have a clear and certain deadline and did not put the insurer on notice that a failure to settle would subject its insured to an excess judgment. This case is exactly the opposite.

The *First Acceptance* demand involved two letters that had to be read in conjunction to understand they together constituted an offer to settle. Indeed, the attorney who received them did not think the letters were "any kind of time limit demand" and filed them away without response. 305 Ga. at 491. The Supreme Court had to apply default rules of contract construction to determine that the demand had no time limit. *Id*. at 495-96. After doing so, the court ruled, there was no actionable failure to settle because the "offer was not a time-limited settlement demand." *Id*. at 497. In this case, the *Brightman* Demand included a clear deadline. (Exhibit E, p. 3) The deadline was extended for MSIC's benefit in clear and uncertain terms. (Exhibit H)

The significance of the lack of a clear deadline is that the insurer in *First Acceptance* was not put on notice that "it needed to respond within [a deadline] or risk that its insured would be subject to a judgment in excess of the policy limits." *Id*. at 496-97. In this case, the *Brightman* Demand put MSIC on notice in clear language that a failure to accept it would subject Dr. Womack to an excess

19

judgment. (Exhibit E, p. 4) Shamp reminded MSIC of the bad-faith exposure when she extended the deadline. (Exhibit H)

Because of the lack of a clear deadline and the lack of notice of excess exposure, the *First Acceptance* demand went without a response. The holding in *First Acceptance* is to protect insurers from liability for missing demands without deadlines and that do not put the insurer on notice of excess exposure. Those concerns do not exist with the *Brightman* Demand in this case.

Finally, although the insurer prevailed in *First Acceptance*, it was after discovery and not on a motion for judgment on the pleadings. *First Acceptance* made a ruling on duty, but it did so after discovery. This Court should do the same and deny the motion.

### D.    MSIC Voluntarily Assumed the Duty to Respond to the Demand.[5]

A party "may be held liable for the negligent performance of a voluntary undertaking." *Osowski v. Smith*, 262 Ga. App. 538, 540 (2003). "When one undertakes an act that he has no duty to perform and another person reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care." *Id.* at 540. "An insurer is itself supposed to be an expert in

---

[5] Although Dr. Womack presents other theories on MSIC's duties, Dr. Womack respectfully submits that this case involves a straightforward application of *Brightman*. MSIC had duty under the Policy and Georgia common law to reasonably respond to the *Brightman* Demand and do what it could to settle.

valuing cases, and it is obligated to make its own evaluation of claims made against its insureds." Windt, 1 Insurance Claims and Disputes § 5:1 (6th ed.).

The Supreme Court of Georgia has ruled that a negligent undertaking can arise in a variety of situations and with regard to a variety of torts. *Georgia CVS Pharmacy, LLC v. Carmichael*, 316 Ga. 718, 741 (2023). Although arising out of a contract, the negligent-failure-to-settle claims alleged in this action sound in tort. *Whiteside*, 311 Ga. at 352. The voluntary undertaking doctrine informs this case.

The duty to perform a voluntary undertaking with reasonable care applies within a contractual relationship. *Monitronics v. Veasley*, 323 Ga. App. 126 (2013). In *Monitronics*, an alarm company failed to inform a customer that her alarm had triggered, allowing a jury to determine that "failure to provide her with full information about the alarms increased her risk of harm." *Id*. at 131-32.

Dr. Womack asked MSIC to try to settle, and MSIC responded that it would decide when to do so. (Exhibit C) When it received the *Brightman* Demand, MSIC undertook the duty to gather more information to evaluate it and decided precisely how to respond. (Exhibit G, p. 1 and Exhibit K) MSIC's argument that it had no duty to settle in response to the *Brightman* Demand begs the question as to whether MSIC had a duty to reasonably perform the duties it undertook to perform. Having voluntarily undertaken the duty to evaluate and respond to the demand, and having

21

taken control of those duties exclusively, MSIC cannot credibly argue it could respond negligently or in bad faith.

The complaint alleges (and Exhibit F confirms) that Dr. Womack desperately needed his liability insurer to reasonably respond to the *Brightman* Demand. This Court should deny the motion and rule MSIC had a duty to reasonably respond to the *Brightman* Demand. Dr. Womack relied on MSIC's undertaking, because MSIC told him to rely on his insurer. (Exhibit C) Exhibit F was not sent to Dr. Womack. So, like the alarm company in *Monitronics*, MSIC withheld important information from Dr. Womack, that he faced a substantial likelihood of an excess judgment. All of this harmed Dr. Womack, as he now has a $45 million judgment against him.

## IV.    CONCLUSION

In response to the *Brightman* Demand, MSIC decided it wanted to try to bargain at mediation and save some of its limits. (Exhibit L) Thus, MSIC gambled to try to shave money off of its obligation to pay policy limits. MSIC lost that bet. Facing accountability for its bad-faith conduct, MSIC seeks a premature exit based on a strained and self-serving interpretation of the law. Because the pleadings and central documents, construed in Dr. Womack's favor, clearly establish the existence of a duty and a host of factual disputes regarding its breach, MSIC's Motion for Judgment on the Pleadings must be denied.

Respectfully submitted this 18th day of July, 2025.

/s/ Richard E. Dolder, Jr.
James (Jay) Sadd
Georgia Bar No. 066010
Richard E. Dolder, Jr.
Georgia Bar No. 220237
**SLAPPEY & SADD, LLC**
352 Sandy Springs Circle
Atlanta, GA 30328
Ph: (404) 255-6677
Fax: (404) 255-7340
rich@lawyersatlanta.com
*Attorneys for Dr. Womack*

23

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Plaintiff's Brief in Opposition to Defendant's Motion for Judgment on the Pleadings.** was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record for all parties. I further certify that the foregoing was prepared in Times New Roman 14pt font and otherwise complies with Local Rule 5.1.

Respectfully submitted this 18th day of July, 2025.

/s/ Richard E. Dolder, Jr.
Richard E. Dolder, Jr.
Georgia Bar No. 220237
**SLAPPEY & SADD, LLC**
352 Sandy Springs Circle
Atlanta, Georgia 30328
Ph: (404) 255-6677
Fax: (404) 255-7340
rich@lawyersatlanta.com
*Attorney for Dr. Womack*