## Claudia T. West

| | |
|---|---|
| **From:** | Beth W. Kanik |
| **Sent:** | Tuesday, March 13, 2018 11:12 AM |
| **To:** | 'Mike Tamucci'; John E. Hall |
| **Cc:** | Claudia T. West |
| **Subject:** | RE: Jonathan Buckelew v. Matthew Womack, MD & North Fulton Emergency Physicians, LLC, File 5009504-01 |
| **Attachments:** | Buckelew summary revised from adjuster.DOCX |

Mike,

See attached.
Report from Womack depo in dictation but call me if you want a verbal.

Beth.

**Beth W. Kanik**
**HALL BOOTH SMITH, P.C.**
191 Peachtree Street, Ste. 2900
Atlanta, GA 30303
Direct Dial: 404-954-6950; Fax: 404-954-5020
E-mail: bkanik@hallboothsmith.com
Website: www.hallboothsmith.com

**From:** Mike Tamucci [mailto:Mike.Tamucci@MMICNC.COM]
**Sent:** Monday, March 12, 2018 12:23 PM
**To:** John E. Hall; Beth W. Kanik
**Cc:** Mike Tamucci
**Subject:** Jonathan Buckelew v. Matthew Womack, MD & North Fulton Emergency Physicians, LLC, File 5009504-01

Hey Beth and John,

I ran into plaintiff attorney Laura Shamp last week and she was quite proud of the finger pointing in this case by the co-defendants. It looks like we have challenges with conflicting testimony and charting by Dr. Futrell and Dr. Waldschmidt. I'd like to try and get my arms around the specific issues and where they fall in the four-hour time line of involvement by Dr. Womack. I have attached a free-flowing chronology of events with my understanding of the issues and some questions. Please take a look at the attached and update, correct, and answer the questions asked. My concern with this case is the overall defensibility being compromised by the conflicting testimony of the co-defendants. As we know, the patient's damages are extensive with locked in syndrome. Please let me know if you have any questions or need any additional information. Thank you.

Sincerely,

Mike



Medical Mutual™
PROTECTING OF A PROFESSION

Mike Tamucci                                    tel: 919.501.7626        700 Spring Forest Road Suite 400

1

**EXHIBIT**

**A**

*Southeast Claims Analyst*
Claims
Mike.Tamucci@MMICNC.COM

tel: 800.662.7917
fax: 919.878.7592
cell: 470.522.3702

Raleigh, NC 27609
www.medicalmutualgroup.com

Connect with us:

Confidentiality: The information in this electronic mail may contain confidential, sensitive and/or protected health information intended only for the addressee(s). Any other person, including anyone who believes he/she might have received it due to an addressing error, is requested to notify this sender immediately by return e-mail, and shall delete it without further reading and retention. The information shall not be forwarded or shared unless in compliance with MMIC policies on confidentiality, and/or the written permission of this sender

## Synopsis

32-year old male presented to the North Fulton Hospital ED by EMS with a reported seizure and post-ictal after a chiropractic neck adjustment. The insured ER physician saw the patient and ordered a CT and CTA, which were read as showing a normal basilar artery and described an age-indeterminate vertebral artery dissection vs. a congenital anomaly. (It is acknowledged by all, including the defendant radiologist, that the CTA shows a basilar artery which was occluded by a thrombus and was not reported). Following a conversation with the on-call neurologist (see conflict below) which the insured documented in the chart as well a statement that as the basilar artery was flowing normally this is not thought to be an acute finding, the plan was to admit the patient to the hospitalist service, to order an LP to address a fever which had developed while in the ED and to rule out an infectious cause. While in the ED, the patient had a seizure witnessed by the ER physician and was intubated. After the LP, the insured called the ICU and the patient was admitted to their service. After reporting to the family, the insured went off shift. The following day the patient was diagnosed with a massive non-hemorrhage basilar artery occlusion and brain stem stroke resulting in locked in syndrome.

## Conflicts

Co-defendant neurologist Dr. Futrell entered a note three days after the event and claimed he was never informed by the insured about the chiropractic care or that a CTA had been ordered and resulted. Dr. Futrell charted he was not told because he checked his phone records and the call had been over minutes before the CTA result was available. The phone log produced by Verizon contradicts this as the results were available at 6:51 p.m. and the call with Dr. Womack was over at 6:52 p.m. (six minute phone call). In discovery, Dr. Futrell produced a screen shot from his cellular phone which identifies the call as being four minutes. At deposition, he admitted that he had been told that the CT of the head had been ordered and was reported as normal and that they had discussed an LP and admission to the hospital. Defense experts think any comment regarding the basilar artery as charted in Dr. Womack's 6:50 p.m. note would not be within the scope of an ED physician. This shows the information came from Dr. Futrell and the CTA was discussed. The 6:50 p.m. note states the CT/CTA was discussed with Dr. Futrell and quotes the CTA result with additional language (basilar artery filling normally).

Co-defendant radiologist Dr. Waldschmidt testified he discussed by phone the CT and CTA results with Dr. Womack. No phone calls are documented in Dr. Waldschmidt's reports. This also creates another phone issue as Dr. Womack states he did not speak to Dr. Waldschmidt. In retrospect, Dr. Waldschmidt testified his report identifying a normal appearing basilar artery was incorrect. He did not view this a breach of the SOC. He also agreed in retrospect the description of the left vertebral artery showing a normal radiographic appearance was inaccurate, but this also was not a breach of the SOC. Dr. Waldschmidt thinks because his report identified a dissection, that was sufficient to lead to appropriate treatment by the treating physicians and there was no breach of the SOC.

## Time Line

**10/26/15:** The 32-year old married male was seen by Dr. Axt, chiropractor at Advanced Integrative Medicine, with a complaint of neck pain for four days after working out at the gym. The patient had a two-week history of fevers and headaches after he had been in a detoxification program (run by Dr. Bergeron) in Roswell. The patient had been on methadone for eight years following his heroin addiction. His mother recommended that he see a chiropractor, Dr. Axt.

Dr. Axt noted the patient also complained of episodes of blurred vision and ringing in his ears. Dr. Axt adjusted the patient's neck while lying down. When the patient tried to sit up, he became dizzy and seemed disoriented. Dr. Axt left the room to find help. When he returned the patient was less responsive. William Almon, MD, who was a practitioner at Advanced Integrative Medicine, dictated the notes. He described the patient's eyes as open, but was unresponsive and had asymmetry of his pupils with left greater than right. Dr. Amon suspected an aneurysmal bleed. Dr. Almon is no longer employed with the group. He was recently featured in an investigation performed by the Atlanta Journal-Constitution on doctors accused of sexual abuse that may create credibility and character issues if he is called as a witness. Defense counsel for the group does not know Dr. Almon's location and will try and avoid having to produce him as a witness.

**At 3:53 p.m.** 911 was called.

**At 4:20 p.m.** the patient arrived at the North Fulton Hospital ED by EMS with symptoms of a seizure and a history of the events that occurred 20-30 minutes prior during the chiropractic adjustment. The patient was verbally nonresponsive, but was able to respond to commands. His Glasgow Coma Scale (assessment of impairment of conscious level in response to defined stimuli) score was 11 (11 indicates moderate injury; 3-worst & 15-best; 13 & above correlates with brain injury) and pupils were equal, round and reactive to light. Shortly thereafter, the patient's mother arrived and was the primary historian. His father, brother, sister-in-law and wife all subsequently arrived, as well. Dr. Womack met EMS at arrival and spoke to them.

**By 4:27 p.m.** the patient was examined by the **insured ER physician, Dr. Womack,** who completed his residency four months prior in June 2015 and was board eligible in emergency medicine.

**At 4:39 p.m.** Dr. Womack ordered a CT and CTA and labs due to a high suspicion of a dissection. The CT & CTA were delayed (approximately 30 minutes) when a trauma patient came in. The patient's mother was concerned about the delay and spoke generally about having her son transferred. Dr. Womack reassured her that the delay would not be significant and advised if in fact there had been a transfer, it would have lengthened the process as opposed to shortening it. However, if stroke had been suspected, then the stroke protocol would have been instituted and instead of being bumped to second, the patient would have remained first in line for the CT. Dr. Womack spoke to the patient's mother and she reported that he had headaches and fever for ten days which added meningitis/encephalitis prominently in Dr. Womack's differential. She also told him that the patient had been on methadone and that fact added a possible drug withdrawal/reaction to his differential diagnosis process.

**At 6:12 the CT without contrast was read by co-defendant neuro-radiologist, Dr. Waldschmidt as normal.** The radiology report stated: "No radiographic evidence of acute intracranial hemorrhage, acute stroke, or abnormal intracranial mass lesion." Dr. Waldschmidt testified he called (used hospital phone) and spoke to Dr. Womack (for 5-10 seconds) with the normal results around the same time he dictated his report. He said Dr. Womack responded, "Got it." This conversation is denied by Dr. Womack and is not recorded in the hospital records. Dr. Waldschmidt testified it was his custom and practice to call the ED when reporting on a CT of the head and he vaguely recalled this call.

*What do the hospital phone records show? Was this alleged phone call prompted by the Stat order? Does the insured recall being called like this with prior patients? Is the reading of this study in question? With a normal read of the CT without contrast, does the disputed phone call only effect creditability – and not medical treatment?*

*Answer; We do not have the phone records. The insured denies being called with normal studies. Dr. Waldschmidt testified that he always calls the ED with reports on CT/head and CTA head/neck. The reading of this study is not in question. The disputed call affects only credibility.*

**At 6:46 p.m. the CTA was read by Dr. Waldschmidt and he dictated his findings about the same time.** The radiology report's impression stated: "(1) Very small caliber of right vertebral artery intermittently identified over its expected course. This may be due to normal congenital variation of dominant left vertebral system or may represent sequelae of age-determinate dissection. Right vertebral artery does not contribute to formation of basilar artery. (2) Normal radiographic appearance of left vertebral artery. (3) Normal radiographic appearance of common carotid arteries, and extracranial internal carotid arteries."

Dr. Waldschmidt testified he called a second time (used hospital phone) and spoke to Dr. Womack (for 5-10 seconds) regarding the CTA. He told Dr. Womack he saw either a dissection of the right vertebral artery or a congenital abnormality. This could have been a new dissection or an old dissection (he could not tell) and it needed to be correlated clinically. Dr. Waldschmidt said Dr. Womack responded, "Got it." Dr. Waldschmidt admitted he never discussed the basilar artery with Dr. Womack. That means the information in Dr. Womack's note "the basilar artery is filling normally so this is not thought to be an acute finding" did not come from that conversation.

*Where did the information come from?*

*Answer: That's the $$$ question. If it didn't come from Waldschmidt, if such knowledge would have been beyond that of the insured to identify as significant, if it is then beyond the expertise of a PA, that leaves Futrell.*

**At 6:51 p.m.** the CTA report was finalized/authenticated. The clinical indication listed by Dr. Womack for the CTA study was "pain/dissection." Dr. Waldschmidt does not dispute this information was given, but testified if he had been told of the chiropractic manipulation, he would have been more concerned about an acute dissection.

Dr. Waldschmidt agreed in retrospect, his report identifying a normal appearing basilar artery was incorrect. He did not this was a breach of the SOC. He also agreed in retrospect the description of the left vertebral artery showing a normal radiographic appearance was inaccurate, but this also was not a breach of the SOC. Dr. Waldschmidt thinks because his report identified a dissection, that was sufficient to lead to appropriate treatment by the treating physicians and there was no breach of the SOC.

*So, Dr. Waldschmidt admitted to misreading the films in retrospect? He says he discussed the incorrect reads with the insured? Does he think he misread both the CT without contrast and the CTA? What could have been done differently if the films were read correctly? Could the patient's course have been changed?*

*Answer: (a). Yes as to the CTA, not as to the CT.*
*(b) Yes although he was careful to say that he did not discuss the basilar artery with the insured.*
*(c) Agrees with CT read.*
*(d) He deferred that to clinicians but plaintiff's theory will be: heparin; tpa; transfer to Grady for thrombectomy.*
*(e) Course would have been changed but unclear if outcome would have been changed.*

**At 6:50 p.m.** Dr. Womack and Dr. Amy Coker staffed the North Fulton ED. At this time, Dr. Coker happened to be on the phone with Dr. Futrell, the co-defendant on-call neurologist. Dr. Coker passed the phone to Dr. Womack and he spoke to Dr. Futrell. Dr. Womack recorded in his ER notes that he discussed the findings on both the CT (no bleed) and CTA (basilar artery filling normally) and Dr. Futrell recommended a lumbar puncture and to admit the patient. *Was the admittance to the services of Dr. Futtrell?*

*Answer: Plan was to admit to a hospitalist but when he needed to be intubated, Dr. Womack changed plan to admit to ICU. Womack's impression was that neurology would see in the morning. Futrell denied that; he would have waited for a call from the hospitalist service to take him on as a patient.*

Dr. Womack used a scribe in the ED. The note at issue states: "FUTRELL, MD. PETER R. phone call, consult. Physician recommends LP. Wants hospitalist to admit. Discussed normal head CT and finding of age indeterminate dissection vs. congenital variation with him. As the basilar artery was filling normally this was not felt to be an acute finding."

Three days later on 10/29/15, Dr. Futrell added the following note to the chart. "This note is to clarify the discussion between Dr. Womack & myself while pt. was in ER on evening of 10/26/15. Despite his documentation, we did not at any point discuss the CTA & in fact I was not aware the pt. had CTA until 2 days later, at approx. 1400 on 10/28/15 (in reviewing the records and my phone log, the CTA results were not even available until after 1851 that evening & our conversation took place a few minutes prior to that time)....What I was told by Dr. Womack was that the pt. presented with fever, seizure, not feeling well for several days prior & was given doxycycline from family member (of note, there was no mention of pt. seeing chiropractor). My recommendation commented that encephalitis or meningitis was a concern given hx. It is my understanding that the LP performed & that pt. also experienced another seizure in ER but I was not contacted with CSF results nor was I notified of recurrent seizure."

NOTE: There is a discrepancy between the phone log from Verizon which shows a 6 minute call beginning at 6:46 and the screen shot showing a 4 minute call beginning at 6:46. The CTA report was dictated at 6:46 p.m. and was final at 6:51 p.m. This allowed for a one minute overlap.

*How can we use this to our benefit? That is a brief overlap.*

*Answer: Unclear due to the discrepancy with the phone screen shot. Likely subject to motions in limine. Either a jury will be allowed to consider both and reach their own conclusion, or neither because one is more prejudicial than the other.*

**At 7:09 p.m.,** Dr. Womack updated the family on the CT results and plan for an LP.

**At 7:20 p.m.,** Dr. Womack went to set the patient up for the LP. He noted "patient had another seizure witnessed by myself. Will change status to epilepticus. Family updated on status."

**At 7:27 p.m.** the patient had a seizure and was intubated.

**At 7:48 p.m. the LP was performed at and was collected at 8:11 p.m. The lumbar puncture was normal. Dr. Womack was relieved, but still puzzled as to the cause of the patient's insult. Dr. Womack called critical care and spoke to Christopher Nickum, PA. In the evening, the ICU is covered by the PA. The physician, Dr. Lavinia, comes in the morning. Nickum agreed to admit the patient. Shortly thereafter, Dr. Womack went off since his shift ended at 8 pm.**

**At 8:30 p.m.** PA Nickum examined the patient while in the ED and intubated. PA-Nickum's admitting H&P references the following information: Radiographic data:  CT scan of head, non-contrast, reveals no radiographic evidence of acute hemorrhage, stroke or intracranial masses. Subsequent CT angio of neck performed which was identified over its expected course.  Felt to be due to normal congenital variation of dominant left vertebral system or may possible be sequelae of age-indeterminate dissection. The plan was to consult ID if the spinal fluid was suspicious for meningitis. The patient was febrile in the ICU and under the care of the PA-Nickum. He was given cooling blankets and Tylenol in an effort to reduce his fevers which rose to as high as 106 degrees.

Dr. Lavinia added to the note (likely in the morning of 10/27) with an "attending note" that stated: "Patient seen and examined, all labs and imaging reviewed.  Pt hypothermic with normal appearing CSF studies morning of 10/27. Currently intubated and sedated.  Will send for MRI brain along with MRA neck and brain.  Neurology consulted by ED physician on presentation to ED.  ID also consulted.  Will f/u on MRI/MRA results."

**At 9:00 p.m.** the results of the LP and analysis were reported as normal. The results were not reported to Dr. Womack or the ED. By then Dr. Womack on gone off shift and the patient was admitted under ICU although he remained in the ED until a bed was available.

**At 10:56 p.m.** the patient was transferred from the ED to ICU with a diagnosis of encephalitis and altered mental status.

**On 10/27/15 at 12:20 a.m.** the ICU nurses noted the patient's pupils were sluggish.

**At 10:00 a.m.** the patient was seen by Dr. Lavania. This was 11 hours after being admitted to ICU. He ordered an MRI of the brain and MRA. Dr. Lavinia charted "have reviewed the CTA with radiology/multiple radiologists this a.m., in respect to right vertebral artery. Pt was at chiropractors yesterday.  Will proceed with MRI/MRA brain now." At approximately the same time, Dr. Drexinger, who was then Dr. Futrell's partner, was involved in the care.

**At 12:00 p.m.** the MRA was read and showed a massive non-hemorrhage stroke of the posterior circulation of the brain, including thrombosis of the basilar artery, which had blocked circulation to the pons and both hemispheres of the brain. The results were discussed with Dr. Drexinger, neurologist and Dr. Lavania.

**At 1:37 p.m.** a heparin drip was started. This was the first treatment for stroke after 21 hours of arrival to the hospital.

The patient was diagnosed with locked in syndrome and transferred to a long-term care facility. He was admitted to Landmark in Athens and eventually was accepted into The Shepherd Center.   He is being cared for 24/7 at home.