**Claudia T. West**

| | |
|---|---|
| **From:** | Beth W. Kanik |
| **Sent:** | Thursday, June 07, 2018 10:39 AM |
| **To:** | mike.tamucci@mmicnc.com |
| **Cc:** | John E. Hall; Beth W. Kanik |
| **Subject:** | Buckelew v. Womack, et al. -- Claim #5009504-01 |
| **Attachments:** | {65891109_1}.docx |

Please find attached our "Subsequent 120 Day Report" regarding the subject case.

**Claudia West**
*Legal Assistant*

**Hall Booth Smith, P.C.**
191 Peachtree Street, NE, Suite 2900
Atlanta, GA 30303-1775
T: 404.954.5000, x2100
F: 404.954.5020
cwest@hallboothsmith.com www.hallboothsmith.com

EXHIBIT

B

## BUCKELEW v. MICHAEL AXT, et al.

### SUBSEQUENT 120 DAY REPORT

**Report Date:  June 7, 2018**
**Medical Mutual's Claim Number:** 5009504-01
**Insured(s):** Matthew Womack, M.D. and North Fulton Emergency Physicians, LLC
**Caption:** *Jonathan Buckelew and Christin Buckelew v. Michael Axt; Advanced Integrative Medicine, Inc.; Matthew Womack, MD; North Fulton Emergency Physicians, LLC; James Waldschmidt, MD; James Waldschmidt, MD, P.C.; Peter Futrell, MD; North Fulton Neurology, P.C.; Sachin Lavania, MD; Christopher Nickum; North Fulton Pulmonary Specialists, LLC; North Fulton Medical Center, Inc. d/b/a North Fulton Regional Hospital; Tenet Healthcare Corporation; and Dr. Robert A. Schlampp, P.C.*
**Date Suit Filed:** August 29, 2017
**Date Suit Served:** Womack by acknowledgment on September 22, 2017 and North Fulton Emergency Physicians, LLC was served on September 5, 2017
**Defense Legal Team (Attorneys):** John E. Hall, Jr. and Beth W. Kanik
**Insured's Location:** *Womack:* Georgia – Residence in Atlanta, Fulton County, Georgia *Northside Radiology Associates, P.C.:* Georgia – Registered agent in Norcross, Gwinnett County, Georgia
**Venue:** State Court of Fulton County, Georgia
**Mediation/ADR Date:** None
**Mediation/ADR Result (if already occurred):** N/A
**Co-Defendant's(s') Status:** (note whether expected to be at trial, dismissed, settled out, etc.) We do not expect any defendants to be settled out.
**Evaluation (% chance to win):  40%**
**Estimated Adverse Verdict Range:** (please quantify % chance of verdict in that range). $10 mm - $12 mm
**Estimated Settlement Value:** (please quantify % chance of settlement in that range). $5mm - $7mm
**Estimated Trial Length:** 2-3 weeks
**Trial Date:** N/A although it will be specially set.

I.    Executive Summary (no more than five sentences; should contain: central allegations in case, likelihood of prevailing (including percent chance); likely adverse verdict range; likely settlement range; potential for verdict in excess of insured's policy limit(s); and any special considerations (e.g., venue, issues with co-defendants, trial judge, etc.)

This suit alleges a failure to timely diagnose and treat a basilar artery occlusion and brain stem stroke following chiropractic care on the afternoon of 10/26/2015, leaving the plaintiff, Jonathan Buckelew, bed-ridden and locked in. This is a swearing match between Dr. Womack and the consulting neurologist, Peter Futrell, over what he was told in a phone call by Dr. Womack regarding the admitting history and the testing ordered by Dr. Womack. **Based upon the current position of the parties, we believe that there is a 40% chance of success.** In the event of an adverse outcome at trial, a verdict range of $10 million to $12 million would not be unexpected. Assuming 100% liability, and assuming that Dr. Womack is more credible, we would see the allocation as:  5% - 10% for the chiropractic care; 0%- 10% for Womack; 20% for the neurologist; 40% to the radiologist; and the remainder divided between the Hospital nursing care

and the intensivists. <mark>If one assumes that Dr. Womack did not tell the neurologist and the jury believes he is lying, then we can see his percentage rising up and the neurologist's dropping.</mark>

II.    Parties/Forum

A.    Plaintiff(s)

- *assessment of witness potential and impact on case current condition (partially/permanently disabled, deceased, etc.)*: Plaintiffs are Jonathan Buckelew and Christin Buckelew. Jonathan Buckelew is locked in, bed-ridden, cannot speak and communicates by blinking. Christin Buckelew was sympathetic, emotional but although they are still married, she no longer lives in the same home as him and has not seen him for months. He is being cared for at the family five-bedroom/five-bathroom home in Roswell. **His parents are generally sympathetic but one gets the feeling that they are less than truthful in discussing Jon's drug issues.**
- *date of birth*: 05/24/1983 (Jonathan Buckelew); 01/29/1989 (Christin Buckelew)
- *age at date of loss*: 32 (Jonathan Buckelew); 26 (Christin Buckelew)
- *gender*: Male (Jonathan Buckelew); Female (Christin Buckelew)
- *race/ethnicity*: Caucasian
- *marital status (then and now)*: Plaintiffs have been married since April 18, 2008 but have not lived together since 2016.
- *occupation*: At the time of the incident, he was on short-term disability from his job at an IT call center. Although the disability application listed the cause as headaches and anxiety, he was actually in an out-patient detoxification program to wean off the methadone that he had taken for his heroin addiction. He had been on the methadone for approximately 8 years although Christin's testimony was that he relapsed at one point on marijuana.
- *connection of plaintiff to litigation (estate/guardian ad litem/self)*: Self and wife
- *beneficiaries (including assessment of impact)*: Wife, Christin Buckelew. No children.
- *relevant online/social media presence*: None discovered yet.

B.    Plaintiff's Counsel

- *Law firm name*: Shamp Jordan Woodward
- *Individual attorneys involved*: Laura M. Shamp and Joshua F. Silk
- *Experience/competency (background, ability, known trial experience, experience in this venue)*: Both are experienced attorneys who we anticipate will do an effective job representing the Plaintiffs.
- *Propensity to try vs. settle cases*: This varies on a case-by-case basis, but we have no reason to doubt these attorneys will try this case if necessary.
- *Negotiation style*: Mrs. Shamp can be very aggressive.
- *Propensity to propose/entertain/accept high-low agreements*: Unknown.
- *Recent trial success/failure including verdict amounts as applicable*: She has obtained success at trial and we think it unlikely that she will associate a trial attorney on this case.
- *Other special factors that might influence this case*: Mr. Buckelew is being covered by his wife's insurance (CIGNA) although for a period of time, all bills were being paid out of pocket by his parents because his insurer, Mutual of Omaha, disclaimed since he was on disability at the time of the incident.

C.    Insured Defendant(s)

- *Name(s)*: Matthew Womack, M.D. and North Fulton Emergency Physicians, LLC
- *Gender*: Male
- *Race/ethnicity*: Caucasian
- *Practice/Entity name*: North Fulton Emergency Physicians, LLC
- *Specialty*: Board Eligible Emergency Medicine

- *Medical school/residency*: Ross University (Medical School); University of Toledo (Residency)
- *Number of years in practice*: Approximately six months at time of subject accident post-residency.
- *Experience with procedure/treatment at issue*: He was experienced at the time in calling in for consultations and in ordering imaging tests, which is his issue.
- *Assessment of witness potential and impact on case*: **He made a good witness. Although he feels that he has been railroaded by Dr. Futrell and by Dr. Futrell's former partner, Dr. Drexinger, he maintained his composure.**
- *Other special factors (relating individual insured(s) or practice group) that might influence this case*: As will be discussed infra, Dr. Futrell entered a note three days after the event claiming that he was never informed about the chiropractic care, and not informed that a CTA had been ordered or the result. He also charted that he knew he had not been told because he checked his phone records and the call had been over minutes before the CTA result was available. **In discovery, Dr. Futrell produced a screenshot which shows the call was 4 minutes, beginning at 18:46. However, the log produced also in discovery contradicts this as the result was available at 18:51 and the call with Dr. Womack was over at 18:52.** There was peer review and our understanding is that Dr. Womack was given a letter of concern, based upon Dr. Futrell's note and we suspect that Dr. Futrell may have also received a letter.

D. Defense Counsel

- John E. Hall, Jr., Beth W. Kanik
  E. Co-defendants

  1. Peter Futrell, MD and North Fulton Neurology, P.C.

  - *Assessment of witness potential and impact on case:* He is a key witness because of the reasons outlined above. **He made a fair witness. Dr. Futrell is no longer in the practice and it was not an amiable breakup. While he and Dr. Womack clearly have their differences, the finger pointing was as minimal as possible.**
  - *Other special factors about co-defendant(s) that might influence this case*: Christin Buckelew testified that Dr. Drexinger, Futrell's former partner, encouraged her to file suit (although they didn't realize that Futrell and his practice would be named). In notes produced by Plaintiff, Dr. Futrell is quoted as claiming that Dr. Womack's note was a lie and that Womack implicitly admitted as much to him.[1] Although these notes glorify Dr. Drexinger as an advocate, we have learned that he is no longer the treating neurologist.
  - *Co-defense counsel (for each co-defendant)*: Weathington McGrew, P.C. for Dr. Futrell and Peters & Monyak for the Fulton Neurology, P.C.
  - *Individual attorneys involved*: Paul Weathington and Tracy M. Baker for Dr. Futrell. We do not know the specific attorneys at P&M since they have just appeared.
  - *Experience/competency (background, ability, known trial experience, experience in this venue)*: Both are experienced attorneys who have experience practicing in this venue.
  - *Propensity to try vs. settle cases*: You are familiar with them from other MMICNC cases.
  - *Recent trial success/failure including verdict amounts as applicable that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*: See discussion above.

---

[1] He claims that he subsequently confronted Womack, looked at him and could tell by Womack's eyes the he knew he had lied. Dr.Womack's recollection is that by that time, he had retained counsel and was simply trying to avoid answering Futrell, per counsel's instructions.

- Co-Defendant Information Table

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| Dr. Peter Futrell | Neurologist | North Fulton Neurology, P.C. (Employer) and Mag Mutual and coverage is shared with his practice, NFN. | $2,000,000/$4,000,000 | In case. |

2.   James Waldschmidt, MD and James Waldschmidt, MD, P.C.

- *Assessment of witness potential and impact on case*:  **Dr. Waldschmidt made a poor witness.  He claimed to have had two conversations with Dr. Womack—about the normal CT and about the CTA (which Dr. Womack denies).  He agreed that he did not identify the basilar artery thrombus, but did not believe the failure to do so was a breach in the standard of care.**
- We have not yet deposed Dr. Waldschmidt, but we will update this portion of our report once
- *Other special factors about co-defendant(s) that might influence this case*: None at this time.
- *Co-defense counsel (for each co-defendant)*:  Huff Powell & Bailey, LLC
- *Individual attorneys involved*:  Scott Bailey and Michael Frankson
- *Experience/competency (background, ability, known trial experience, experience in this venue)*:  you are familiar with them.
- *Propensity to try vs. settle cases*:  They will try cases, but will also settle out and enter into confidential high-low agreements.
- *Negotiation style*:  See above.
- *Recent trial success/failure including verdict amounts as applicable*:  No recent verdicts of note, although Scott is an experienced trial lawyer who has obtained defense verdicts as well as taken seven-figure verdicts.
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*:  Candidly, the issue is whether we can remove the focus from the Futrell/Womack dispute to the question of the appropriateness of the radiology read.
- Co-Defendant Information Table

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| James Waldschmidt, MD | Radiologist | James Waldschmidt, MD, P.C. is his employer, and his insurance is through Mag Mutual (via Roswell Radiology Associates) | $1,000,000/$3,000,000 | In case. |

3.  North Fulton Pulmonary Specialists, LLC, Sachin Lavania, MD, and Christopher Nickum

- *Assessment of witness potential and impact on case*: Chris Nickum is a PA-C who is familiar because he previously was employed as a PA by Independent Physicians Resources, an entity which has an affiliation with Apollo. **He made a good witness although the Plaintiff theory was that as a PA, he should not have been managing the ICU. Dr. Lavinia made a good witness, but the theory is that he, not a PA, needed to be in charge.**
- *Other special factors about co-defendant(s) that might influence this case*: None at this time.
- *Co-defense counsel (for each co-defendant)*: Huff Powell & Bailey, LLC
- *Individual attorneys involved*: Brian K. Mathis and David D. Mackenzie
- *Experience/competency (background, ability, known trial experience, experience in this venue)*: Both are experienced attorneys and Brian will point fingers.
- *Propensity to try vs. settle cases*: Please see prior discussion re: Huff Powell & Bailey, LLC
- *Negotiation style*: Please see prior discussion re: Huff Powell & Bailey, LLC
- *Recent trial success/failure including verdict amounts as applicable*: Mr. Mathis recently lost a $7.6 million verdict in Valdosta in a nursing home case (in which he attributed the fault to others than his client).
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*: Candidly, the intensivist had some interaction with Dr. Drexinger and the family. We also believe that while Mr. Nickum never spoke with Dr. Futrell, he will relay what he was told by Dr. Womack about the conversation. They are insured through the Hospital's policy.

- Co-Defendant Information Table

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| Sachin Lavania, MD | Pulmonology – Board Certified in Internal Medicine | North Fulton Pulmonary Specialists (Employer) and Marsh Services Cayman, Ltd. is the insurance broker. | $25,000,000 per occurrence limit with $5,000,000 self-insured retention shared with practice. Unlimited general aggregate. | In case. |
| Christopher Nickum | Physician Assistant | North Fulton Pulmonary Specialists (Employer) and Marsh Services Cayman, Ltd. is the insurance broker. | $25,000,000 per occurrence limit with $5,000,000 self-insured retention shared with practice. Unlimited general aggregate. | In case. |

4.  Advanced Integrative Medicine, Inc. and Dr. Robert A. Schlampp, P.C.

- *Assessment of witness potential and impact on case*: **Vicarious liability for the actions of Dr. Axt, the chiropractor. Dr. Axt made a good witness.**
- *Other special factors about co-defendant(s) that might influence this case*: Observations on Mr. Buckelew and whether he was in fact seizing after the adjustment and whether he was an appropriate candidate for an adjustment. The family notes suggests that any seizures did not in fact occur (another reason why Dr. Womack was concerned and why the family is critical of

Dr. Womack for identifying seizures that they believe did not happen).  Dr. Robert A. Schlampp, P.C. is the entity who Chiropractor Axt's contract was with.  This party was added as a Defendant only very recently.

- *Co-defense counsel (for each co-defendant)*:  Carlock Copeland, Semler & Stair
- *Individual attorneys involved*:  Rolfe M. Martin and Michael Diorio
- *Experience/competency (background, ability, known trial experience, experience in this venue)*: Both are experienced lawyers who have experience in the forum jurisdiction.
- *Propensity to try vs. settle cases*:  Rolfe will be aggressive in pointing fault at the other defendants.
- *Negotiation style*:  We anticipate that they will argue that a lack of proximate cause is present since the neurological issues were identified and EMS called. We also suspect he will argue that the dissection occurred for reasons unrelated to the adjustment, temporal issues notwithstanding.
- *Recent trial success/failure including verdict amounts as applicable*:  We are familiar with Rolfe. His discovery responses indicate that he is ready to argue lack of causation and point fingers.
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*:  We suspect he will work with Dr. Axt's attorney in limiting their exposure by pointing fingers at the other defendants.
- Co-Defendant Information Table

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| Advanced Integrative Medicine, Inc. | Mixed, but Plaintiff received chiropractic care here. | This entity is an employer, and its insurer is Admiral Insurance Company | $1,000,000/$3,000,000 | In case. |

5. Tenet Healthcare Corporation and North Fulton Medical Center, Inc. d/b/a North Fulton Regional Hospital

- *Assessment of witness potential and impact on case*:  **No witness has been deposed.**
- *Other special factors about co-defendant(s) that might influence this case*:  Deep pocket.
- *Co-defense counsel (for each co-defendant)*:  Insley & Race
- *Individual attorneys involved*:  Kevin P. Race and Kevin A. Spainhour
- *Experience/competency (background, ability, known trial experience, experience in this venue)*:  Both are experienced attorneys who have experience in the forum jurisdiction.
- *Propensity to try vs. settle cases*:  They will work up the case and then see about settling since Tenet no longer owns this hospital and since Tenet has recently been fined $513 million for fraudulent business practices.
- *Negotiation style*:  We think it likely they will try to settle out before trial.
- *Recent trial success/failure including verdict amounts as applicable*:  Recently took a six-figure verdict in a Wellstar case pending in Fulton County over a patient being dropped from a stretcher. They also represent the hospital in the Barnett case.
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*:  The deep pocket defendant along with the hospitalists.

- *Co-Defendant Information Table*

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| North Fulton Medical Center, Inc. d/b/a North Fulton Hospital | N/A - Hospital | Entity is owned by Tenet Healthcare Corp., and insurer is Marsh Management Services Cayman, Ltd | $25,000,000 per occurrence with unlimited aggregate with a $5,000,000 self-insured retention | In case. |
| Tenet Healthcare Corporation | N/A | See Number 7 in Section XIII below for a more detailed explanation as to this entity. | See Number 7 in Section XIII below for a more detailed explanation as to this entity. | In case. |

6. Michael Axt

- *Assessment of witness potential and impact on case*: **He made a good witness. He had no involvement with your insured.**
- *Other special factors about co-defendant(s) that might influence this case*: Not at this time.
- *Co-defense counsel (for each co-defendant)*: Coleman Talley
- *Individual attorneys involved*: M.B. Satcher, III and Emily E. Macheski-Preston
- *Experience/competency (background, ability, known trial experience, experience in this venue)*: Both are experienced attorneys with litigation experience in the forum venue.
- *Propensity to try vs. settle cases*: See prior discussion re: Rolfe Martin. They will be in lock-step.
- *Negotiation style*: See prior discussion on causation.
- *Recent trial success/failure including verdict amounts as applicable*: Mr. Satcher recently obtained a defense verdict for a chiropractor in a conservative jurisdiction in 2017.
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*: See prior discussion regarding Rolfe Martin.
- *Co-Defendant Information Table*

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| Michael Axt | Chiropractor | Employed by Dr. Robert A. Schlampp, P.C., and his insurer is NCMIC | $1,000,000 per occurrence / $3,000,000 aggregate | In case. |

F. Trial Judge

- *Trial judge name, gender, race/ethnicity*: Judge Eric Richardson, Male, African American
- *Assessment of trial judge's likely impact on case*: We anticipate Judge Richardson will fairly preside over this matter.

- *Recent noteworthy verdicts/hearings/rulings involving this judge*:  We are familiar with him because he is also the judge in <u>Barnett</u>, another locked in stroke case.
- *Is the judge known to be plaintiff or defense oriented?*  He is not as plaintiff oriented as other judges in Fulton County although large verdicts have been obtained in his courtroom.

G.  Venue

- *Location*:  Fulton County, Georgia
- *Court name*:  Fulton County State Court
- *Plaintiff or defense oriented*:  Plaintiff
- *Demographics of likely jurors*:  46.1% White; 44.5% African American; 7.3% Latino; and 7.0% Asian; 16% poverty rate; 91.3% high school graduate or higher; 49.8% hold bachelor's degree or higher.
- *How many jurors will be seated for trial?*  Twelve (12)
- *May we insist upon a unanimous verdict?*  Yes.  *Why not? If not, what is the majority required to obtain a verdict?*  N/A
- *Outcome(s) of recent relevant trial(s) in venue including verdict amounts as applicable*:  None on locked-in syndrome; however, last year there was a $45.6 million verdict involving a woman purportedly caused brain damage at Northside Hospital.  Dan Huff represented the named physician defendant and the practice after the hospital settled out.
- *Is bifurcation permitted?*  Yes pursuant to O.C.G.A. § 9-11-42.  *If so, do you recommend pursuing bifurcation in this case?*  Not in this case.
- *Is there an arbitration agreement that does/will apply?*  No.
- *What local rules are in place that will affect presentation of evidence (e.g., number of expert witnesses), length of trial, and/or outcome (e.g., contributory negligence, comparative negligence)?*  Georgia Evidence Code will govern.  Georgia is a modified comparative negligence state.
- *How will settlements of co-defendants (before verdict) be treated in the event of a plaintiff's verdict against our insured(s)?*  They can be listed for purposes of apportionment on any verdict form.
- *What questions will be asked on the jury verdict form?*  Liability, apportionment, and damages
- *How will the jury apportion negligence among co-defendants?*  See prior discussion.

H.  Insured's Personal Counsel

- *Recommended to insured?*  Discussed and Insured is aware.
- *Why/why not?*  In light of the risk of an excess verdict.

III.    Incident (complete recitation of all relevant facts)

- *Relevant treatment that took place before care at issue*:  Plaintiff Jonathan Buckelew was aged 32. Purportedly, he had a two-week history of fevers and headaches after he had been in a detoxification program run by Dr. Bergeron in Roswell.  Jon had been on methadone for 8 years following his heroin addiction.  His mother recommended that he see her chiropractor Dr. Axt for his neck pain after working out at the gym.

- *Treatment at issue (including location(s)/date(s))*:

  Chiropractor Axt indicates that he adjusted Mr. Buckelew's neck while Mr. Buckelew was lying down and then asked Mr. Buckelew to sit up.  Chiropractor Axt noted that when Mr. Buckelew sat up, he reported that he felt dizzy and seemed disoriented.  Mr. Buckelew's left pupil was dilated and that Mr. Buckelew appeared dazed.  Mr. Buckelew was still oriented. Chiropractor Axt left to get help.

When he returned, Mr. Buckelew appeared less responsive. William Almon, MD,[2] who was a practitioner at Advanced Integrative Medicine, dictated notes. In his notes, he describe Mr. Buckelew's eyes as open but that he was unresponsive and asymmetry of his pupils with left greater than right. Amon suspected an aneurysmal bleed. EMS was called.

Mr. Buckelew was transported by ambulance to North Fulton Hospital where he arrived at approximately 4:20 p.m. which is approximately 20-30 minutes following the event.

Mr. Buckelew's primary ED physician was your insured, Dr. Matthew Womack. In the initial notes, the GCS assigned was an 11. Soon thereafter, Mr. Buckelew's mother, Janice arrived and she was the primary historian while Jon was in the ED. His father and brother and sister-in-law arrived thereafter and his wife, Christin arrived at around the time he was being transferred to the ICU.

Dr. Womack's notes indicate that his family told him that Mr. Buckelew was slowly weaned off methadone by a local doctor using Xanax and that Mr. Buckelew had complained about a headache earlier in the morning and was acting "somewhat abnormal" according to his mother. There was no history of prior seizures but that Mr. Buckelew was on Dilantin sometime prior to the date of the subject accident to help him wean off Methadone but that he was not taking anti-seizure medication on the date of the subject incident, per his mother. **She denied giving this history at her deposition.**

At 4:39 p.m., Dr. Womack ordered a CT of the brain and a CTA of the neck. Between the time that Dr. Womack saw Mr. Buckelew and the time that the CT and CTA were performed, a new trauma patient arrived who was prioritized over Mr. Buckelew in terms of having the diagnostic imaging performed for approximately 30 minutes.

The CT was read by co-defendant radiologist Dr. Waldschmidt as showing no hemorrhage or acute ischemic event or mass covering lesion. The CTA was also read by Dr. Waldschmidt. The clinical indication listed by Dr. Womack for the CTA study was "pain/dissection."

On the CTA, Dr. Waldschmidt's impression was:

1.  Very small caliber of right vertebral artery intermittently identified over its expected course. This may be due to normal congenital variation of dominant left vertebral system or may represent sequelae of age-determinate dissection. Right vertebral artery does not contribute to formation of basilar artery.
2.  Normal radiographic appearance of left vertebral artery.
3.  Normal radiographic appearance of common carotid arteries, and extracranial internal carotid arteries.

The report was dictated and finalized/authenticated at 16:51.

Dr. Womack used a scribe in the ED. This note at issue states:

**10/26/2015 18: 50: 00, FUTRELL, MD. PETER R. phone call, consult. Physician recommends LP. Wants hospitalist to admit. Discussed normal head CT and finding of age indeterminate dissection vs. congenital variation with him. As the basilar artery was filling normally this was not felt to be an acute finding.**

At 19:09, Dr. Womack updated the family on the CT results and plan for an LP.

---

[2] Dr. Almon is no longer employed. He was recently featured in an investigation performed by the *Atlanta Journal-Constitution* on doctors accused of sexual abuse that may create credibility and character issues if he is called as a witness. More detailed information can be found here: http: //doctors.ajc.com/georgia_doctor_sex_abuse. Rolfe Martin has told us that he does not know his location and will avoid having to produce him.

At 19:20, Dr. Womack went to set the pt up for the LP. Dr. Womack noted, "pt had another seizure witnessed by myself. Will change status to epilepticus. Family updated on status."

The LP was performed at 19:48. Indication was listed as headache, possible meningitis, neurologic workup. It was collected at 20:11.

At 20:07, Christopher Nickum PA was called to consult. He was the PA-C in the ICU. He agreed to admit to the ICU for Dr. Lavinia, the intensivist.

Our understanding is that Dr. Womack went off shift shortly thereafter.

PA Nickum's admitting H&P note is timed at 20:37. It references the following significant information:

Radiographic data: CT scan of head, noncontract, reveals no radiographic evidence of acute hemorrhage, stroke or intracranial masses. Subsequent CT angio of neck performed which was identified over its expected course. Felt to be due to normal congenital variation of dominant left vertebral system or may possible be sequelae of age-indeterminate dissection.

The plan was to consult ID if the spinal fluid was suspicious for meningitis. He was febrile in the ICU and under the care of the PA, Nickum. He was given cooling blankets and Tylenol in an effort to reduce his fevers which rose to as high as 106 degrees.

The results of the analysis from the CSF was available at approximately 21:00. It was negative.

Dr. Lavinia added to the note with an "attending note" that stated, "Pt. seen and examined, all labs and imaging reviewed. Pt hypothermic with normal appearing CSF studies morning of 10/27. Currently intubated and sedated. Will send for MRI brain along with MRA neck and brain. Neurology consulted by ED physician on presentation to ED. ID also consulted. Will f/u on MRI/MRA results."

At 10:55 a.m. on 10/27, Dr. Lavinia charted "have reviewed the CTA with radiology/multiple radiologists this a.m., in respect to right vertebral artery. Pt was at chiropractors yesterday. Will proceed with MRI/MRA brain now. At approximately the same time, Dr. Drexinger, who was then Dr. Futrell's partner, was involved in the care.

At 12:00, the MRA of the head w/o contrast was reviewed and the impression was of:
1. marked abnormal appearance of basilar artery with little if any flow at that site;
2. Distal right vertebral artery not visualized;
3. Dim unitive bilateral posterior cerebral arteries.

We understand that efforts to have him transferred to Grady were unsuccessful because it was thought that too much time had passed.

**Dr. Futrell's note on 10/29 timed at 14: 40 states as follows:**
**This note is to clarify the discussion between Dr. Womack & myself while pt. was in ER on evening of 10/26/15. Despite his documentation, we did not at any point discuss the CTA & in fact I was not aware the pt. had CTA until 2 days later, at approx. 1400 on 10/28/15 (in reviewing the records and my phone log, the CTA results were not even available until after 1851 that evening & our conversation took place a few minutes prior to that time). What I was told by Dr. Womack was that the pt. presented with fever, seizure, not feeling well for several days prior & was given doxycycline from family member (of note, there was no mention of pt. seeing chiropractor). My recommendation commented that encephalitis or meningitis was a concern given hx. It is my understanding that the LP performed & that pt. also experienced another seizure in ER but I was not contacted with CSF results nor was I notified of recurrent seizure.**

- *Relevant treatment that took place after care at issue*: He was admitted to Landmark in Athens and then to the Shepherd Center. Currently, his parents are caring for him at the family home.
- *Alleged causal connection between care at issue and patient's injury*: See discussion above although we believe that a causation issue may involve whether or not he would have been a candidate for thrombolytics or a thrombectomy and whether thrombectomy was standard of care in 2015.
- *Any other relevant facts (break down by category)*: See discussion above regarding Dr. Womack and Dr. Futrell as well as the discussion on the radiology.
- *Patient's current condition (if patient is deceased, state so)*: See discussion above.
- *Patient's prognosis and life expectancy*: We anticipate to retain experts on life expectancy.

IV.     Issues/Allegations/Nature of Dispute

- *Liability (including each chargeable component: negligence, gross negligence, willful/wanton/fraud)*: We suspect that this will be a gross negligence case as to your insured.

- *Causation issues*:

    1. Lack of proximate cause/superseding cause as to all defendants, specifically related to the chiropractor and also to the radiologist.

    2. Whether or not he would have been a candidate for either thrombylitcs or a thrombectomy and the difference it would have made in the ultimate outcome.

- *Any affirmative defenses*: Yes.
- *Statute of limitations defense*: None.
- *Statute of repose defense*: None.

V.      Discovery/Activity Completed to Date - Excluding expert opinions, but including though not limited to:

- *Discovery exchanged*: Written discovery has been exchanged, and we are in the process of propounding non-party requests for production of documents based upon responses provided by Plaintiffs and co-defendants. **Expert depositions will begin soon.**
- *Investigative activity*: Not at present.
- *Audit trail of EMR and/or VOIP (phone system) obtained/produced? If no, why not?* **There is no EMR audit trail that directly impacts Dr. Womack.**
- *Preservation accomplished? If no, why not?* N/A as to your insured.
- *Investigation of insured's phone/tablet/email account content that could be applicable. If no, why not?* We have provided Dr. Futrell's phone log that was produced in his discovery responses. N/A as to your insured.
- *Significant EMR problems/issues*: See discussion regarding Womack/Futrell notes.
- *Have relevant practice policies/procedures been obtained and how do they impact case? If no, why not? Unknown at present.*
- *Have relevant provider schedules been obtained and how do they impact case? If no, why not?* Yes, the schedules have been obtained and show that Dr. Womack was working 10 a.m. - 8 p.m. on 10/26.
- *Are non-medical experts appropriate/recommended (e.g., Forensic IT, ACA, billing/coding specialist, annuitist, private investigator, etc.)? If no, why not?* Annuitist and life care planner will review.
- *Recommendations for additional research*: None at present.

VI.    Experts

A.    Known Plaintiff's Experts

1.    Jennifer Adamski, DNP, APRN, ACNP-BC, CCRN

- *Specialty (medical or non- medical)*:  Nursing
- *Standard of care, causation, and/or damages, or non-medical opinions*:  The nurses at North Fulton Hospital deviated from the standard of care by not notifying a physician when Mr. Buckelew's condition changed overnight on the evening of October 26, 2015 through the morning of October 27, 2015, in particular that Mr. Buckelew's pupils were sluggish and that his blood pressure and heart rate were both elevated.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:  Nurse Adamski is identified as aa nursing professor at Emory University.  We are unfamiliar with her.

2.    Craig Baumgartner, PA-C

- *Specialty (medical or non- medical)*:  Physician's Assistant
- *Standard of care, causation, and/or damages, or non-medical opinions*:  Christopher Nickum deviated from the standard of care by not consulting with Dr. Lavinia after seeing the patient, by not considering and ruling out a vascular cause of the patient's symptoms, and by not reviewing the results of the CSF studies and at that time consulting with Dr. Lavinia to discuss a potential vascular cause of the patient's symptoms.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:  Mr. Baumgartner has been working as a PA-C since 1994.  He is based in Chicago.

3.    Aaron Waxman, MD

- *Specialty (medical or non- medical)*:  Pulmonary and Critical Care Medicine
- *Standard of care, causation, and/or damages, or non-medical opinions*:  Dr. Lavania deviated from the standard of care by not considering and ruling out a vascular cause of Mr. Buckelew's symptoms when he was consulted.  He is also of the opinion that Dr. Lavania should have seen and evaluated the patient at the time he was transferred to the ICU.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:  Dr. Waxman is at Harvard.

4.    Romanus Roland Faigle, MD

- *Specialty (medical or non- medical)*:  Neurologist
- *Standard of care, causation, and/or damages, or non-medical opinions*:  Dr. Futrell deviated from the standard of care by not considering and ruling out a basilar thrombosis in the setting of a vertebral artery dissection in Mr. Buckelew.  Dr. Futrell should have reviewed the imaging studies himself.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:  Dr. Faigle is an Assistant Professor of Neurology at The Johns Hopkins University School of Medicine.

5. Anthony Mancuso, MD

- *Specialty (medical or non- medical)*: Radiology
- *Standard of care, causation, and/or damages, or non-medical opinions*: Dr. James Waldschmidt deviated from the standard of care by not appreciating an indisputable, acute or subacute vertebral basilar artery occlusion due to a vertebral-basilar dissection on the October 26, 2016 CTA for Mr. Buckelew.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: He testified for the plaintiffs in the Barnett case and is mostly a plaintiff's expert.

6. Martin Lutz, MD

- *Specialty (medical or non- medical)*: Emergency Medicine
- *Standard of care, causation, and/or damages, or non-medical opinions*: Dr. Womack deviated from the standard of care by not discussing all of the imaging ordered in the ER, including the CTA with the consulting neurologist and by not discussing with the consulting neurologist all the pertinent medical history including a recent adjustment by a chiropractor, all in reliance on what Dr. Futrell said in his note.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: He testifies primarily for plaintiffs.

7. William J. Lauretti

- *Specialty (medical or non- medical)*: Chiropractor
- *Standard of care, causation, and/or damages, or non-medical opinions*: Chiropractor Lauretti is of the opinion that Chiropractor Axt violated accepted chiropractic practices by manipulating Mr. Buckelew's neck when he had demonstrated focal neurological deficits in conjunction with new onset neck pain and headache.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Mr. Lauretti has been serving as an Associate Professor of Chiropractic Clinical Sciences at New York Chiropractic College since 2005 and includes that he has been an expert witness in cases since 1998. He is registered with an expert witness service.

**8. Cathy Gragg-Smith**

- *Specialty (medical or non- medical)*: **Life Care Planner**
- *Standard of care, causation, and/or damages, or non-medical opinions*: **No report has been produced yet. .**
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: **Frequent witness.**

B. Defense Experts

1. Standard of Care Emergency Department Review

- *Name*: Matthew DeLaney, MD
- *Specialty (medical or non- medical)*: Board Certified in Emergency Medicine

- *Standard of care, causation, and/or damages, or non-medical opinions*: Supportive.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Dr. DeLaney is an assistant residency program director at the University of Alabama (Birmingham) School of Medicine.

2. Neurologist (causation and also Futrell)

- *Name*: Edward Feldmann, MD
- *Specialty (medical or non- medical)*: Neurology
- *Standard of care, causation, and/or damages, or non-medical opinions*: Supportive of Dr. Womack Dr. Feldmann did not believe any comment upon the basilar artery as recorded in the Womack 18:50 note would be in the purview of an ED physician, which signals to him that Dr. Womack did in fact speak to Dr. Futrell and that Dr. Futrell provided him with this information, contrary to what was later claimed by Dr. Futrell. Second, it is wrong—the filling of the basilar artery does not rule out an acute finding. He also reviewed the CTA and believes that the basilar artery is completely occluded by the thrombus. As a neurologist, Dr. Feldmann believes that an ED physician who consults with him can rely upon his opinions and advice. Similarly, it is appropriate for an ED physician to rely upon the report of a radiologist.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Dr. Feldmann is the chair of the Department of Neurology at the University of Massachusetts Medical School-Baystate and is also Vice President and Medical Director of Neurosciences and Rehabilitation.

4. Neurologist (Causation and also Futrell)

- *Name*: Marc Chimowitz, MD
- *Specialty (medical or non- medical)*: Neurology
- *Standard of care, causation, and/or damages, or non-medical opinions*: Depends on who is telling the truth.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Dr. Chimowitz is a Professor of Neurology at the Medical University of South Carolina with an academic focus on acute stroke management, outpatient stroke consultation, and stroke research including clinical trials.

4. Standard of Care Emergency Department Review

- *Name*: William Barsan, MD
- *Specialty (medical or non- medical)*: Emergency Medicine and also causation
- *Standard of care, causation, and/or damages, or non-medical opinions*: Dr. Barsan is supportive of Dr. Womack.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Dr. Barsan is a Professor of Emergency Medicine at the University of Michigan School of Medicine.

C.  Co-Defendant's(s) Experts

**Co-defendants did not identify their experts in their written discovery responses; however, we know that Dr. Callahan at Vanderbilt was retained by Dr. Futrell.** We will update this portion of our report once we know the identities of our co-defendants' experts.

- Name
- Specialty(medical or non-medical)
- Standard of Care, Causation, and/or Damages, or non-medical opinions
- Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, *etc.*)

VII.    Deposition Tracking - Update table quarterly.

*Note:  The following charts only reflect depositions that have been scheduled.  We will supplement and update these charts as additional depositions are scheduled.*

| Deponent's Name | Initially Scheduled Date | Currently Scheduled Date | Completed Date | Date Summary sent to MMICNC |
|---|---|---|---|---|
| **Matthew Womack, MD** | 03/09/2018 | 03/09/2018 | 3/9/2018 | 3/12/2018 |
| **James Waldschmidt, MD** | 03/08/2018 | 03/08/2018 | 3/8/2018 | 3/9/2018 |
| Michael Axt, D.C. | 03/01/2018 | 03/01/2018 | 5/17/2018 | 5/22/2018 |
| **Peter Futrell, MD** | 03/02/2018 | 03/02/2018 | 3/2/2018 | 3/12/2018 |
| **Bernard R. Drexinger, MD** | 03/01/2018 | 03/01/2018 | 3/1/2018 | 3/12/2018 |
| **Jack Buckelew (Father)** | 02/08/2018 | 4/25/2018 | 4/25/2018 | 4/26/2018 |
| **Janice Buckelew (Mother)** | 02/08/2018 | 2/8/2018 | Not completed | |
| Christin Buckelew (Plaintiff Wife) | 02/08/2018 | 02/08/2018 | 02/08/2018 | 2/19/2018 |
| **Christopher Nickum,PA** | 5/3/3018 | 5/3/2017 | 5/3/2017 | 5/7/2017 |
| **Sachin Lavinia,MD** | 5/8/2018 | 5/8/2018 | 5/8/2018 | 5/9/2018 |

Depositions Costs Estimate – Fact (F), Plaintiff Experts (PE), Co-Defendant Experts (CE)

| Deponent's Name | Type of Witness (F, PE, CE) | Estimated expense[1] for live attendance | For out-of-state depositions, estimated expense[2] for videoconference attendance |
|---|---|---|---|
| Christin Buckelew | F | $2,500 | Not applicable |
| Janice Buckelew | F | $2,500 | Not applicable |
| Jack Buckelew | F | $2,500 | Not applicable |
| Bernard R. Drexinger, MD | Treating Doctor | $4,000 | Not applicable. |
| Peter Futrell, MD | Treating Doctor | $4,000 | Not applicable. |
| Michael Axt, D.C. | Treating Chiropractor | $2,500 | Not applicable. |
| James Waldschmidt, MD | Treating Doctor | $2,500 | Not applicable. |
| Matthew Womack, MD | Treating Doctor | $2,500 (including prep) | Not applicable. |

[1] Expense includes total attorney fees and travel expenses
[2] Expense includes total attorney fees, travel expenses, and videoconference fees

Defense Experts

| Expert's Name | Specialty | Hourly Rate | Estimated Expert Fees | Estimated Atty fees & expenses for deposition |
|---|---|---|---|---|
| Matthew DeLaney, MD | Emergency Medicine Standard of Care | $350/hour | $10,000 - $15,000 | $2,500 - $5,000 |

| Marc Chimowitz, MD | Neurology | $525/hour | $10,000 - 20,000 | $2,500 - $3,500 |
| Edward Feldmann, MD | Neurology | $500/hour | $10,000 - $20,000 | $2,500 - $3,500 |
| William Barsan, MD | Emergency Medicine Standard of Care | $350/hour | $10,000 - $15,000 | $2,500 - $4,000 |

VIII.  *Stage of Proceeding (mediation-including identity and assessment of mediator, trial date, position on calendar and likelihood of being reached, settlement discussions)* – Depositions of fact witnesses.

IX.  *Significant Evidentiary or Procedural Factors (motions)* – See discussion regarding causation.

X.  Damages (detailed assessment of all chargeable components, economic and non-economic, lien issues)

A.  Economic Damages*

|  | Amount Claimed | | Amount we likely owe if liable |
| --- | --- | --- | --- |
| Current Medicals | $ | | $ |
| Future Medicals | $ | | $ |
| Wage Loss | $ | | $ |
| Future Wage Loss | $ | | $ |
| Miscellaneous | $ | | $ |
| Total Specials | $ | | $ |

We do not have updated specials but anticipate they are in seven figures.

- *Does plaintiff have a life care plan?* This has not been produced to us yet. *Has it been produced?* No. *Please summarize.*

- *Does plaintiff have an economist's report?* We anticipate that Plaintiffs will have a report, but they have not produced one yet. *Has it been produced?* No. *Please summarize.*

- *What arguments will you make to reduce future economic damages?* We will retain our own experts to challenge Plaintiffs' experts.

- *What collateral source rule applies in this jurisdiction?* Collateral benefits are not permissible as evidence at trial or as a verdict set-off. *How will that affect this case?*
- *Plan/strategy regarding applicability of ACA premiums to combat plaintiff's forecast of significant future economic damages?* Apparently certain bills were paid by insurance, others were paid out-of-pocket.

B.  *Value of non-economic damages (list the recoverable categories and your best estimate of the most likely amount(s) to be awarded in the event of an adverse verdict).* Significant pain and suffering claim since while he is locked in, he is cognitively intact.

C.  *If applicable, include any caps on damages:* N/A – Georgia's cap was abolished.

D.  *If applicable, will punitive damages be an issue? Treble damages? Under what circumstances?* The only instance is if it is determined that someone lied in their note.

E.  *Applicability of pre-judgment and/or post-judgment interest* – None at this time.

F.  *Liens (Are there liens? If so, who are the lien holders and what are the amounts?)* – Unknown.

G.  *Plaintiff's statement of monetary relief sought(if applicable)* – N/A

H. *Applicable mortality tables* – We will obtain life expectancy testimony on this issue.

XI.     Applicable rules regarding mediation/ADR

Mediation is permissive in this case.

XII.    Settlement Discussions

- Amount of specific demand(s) if made:  N/A
- Amount of specific offer(s) if made:  N/A
- Status of any known settlement discussions between plaintiff and any co-defendant(s):  None of which we are aware at this early juncture.

XIII.   Contribution/Indemnity (including any credits)

None of which we are aware at this time.

XIV.    Current Assessment of Case

- *Percent chance for defense verdict for our insured(s)*:  **40%**
- *Percent chance for defense verdict for co-defendant(s)*:  See prior discussion.
- *Most likely adverse jury verdict range*:  $10-$12 million
- Potential for verdict in excess of insureds' policy limit(s):  Yes although plaintiff will likely focus on the hospital and intensivists as the deeper pockets by arguing that interventions could have and should have occurred once the LP was normal.
- Any other important issues:  **There was a joint defense counsel meeting, but to date no co-defendant has identified any authority regarding negotiations.**

65891109-1
4187-0247