## BUCKELEW v. MICHAEL AXT, et al.

### SUBSEQUENT 120 DAY REPORT

**Report Date:** June 6, 2019
**Medical Mutual's Claim Number:** 5009504-01
**Insured(s):** Matthew Womack, M.D. and North Fulton Emergency Physicians, LLC
**Caption:** *Jonathan Buckelew and Christin Buckelew v. Michael Axt;.; Matthew Womack, MD; North Fulton Emergency Physicians, LLC; James Waldschmidt, MD; James Waldschmidt, MD, P.C.; Peter Futrell, MD; North Fulton Neurology, P.C.; Sachin Lavania, MD; Christopher Nickum; North Fulton Pulmonary Specialists, LLC; North Fulton Medical Center, Inc. d/b/a North Fulton Regional Hospital; Tenet Healthcare Corporation; and Dr. Robert A. Schlampp, P.C.*
**Date Suit Filed:** August 29, 2017
**Date Suit Served:** Womack by acknowledgment on September 22, 2017 and North Fulton Emergency Physicians, LLC was served on September 5, 2017
**Defense Legal Team (Attorneys):** John E. Hall, Jr. and Beth W. Kanik
**Insured's Location:** *Womack:* Georgia – Residence in Atlanta, Fulton County, Georgia *Northside Radiology Associates, P.C.:* Georgia – Registered agent in Norcross, Gwinnett County, Georgia
**Venue:** State Court of Fulton County, Georgia
**Mediation/ADR Date:** None
**Mediation/ADR Result (if already occurred):** N/A
**Co-Defendant's(s') Status:** (note whether expected to be at trial, dismissed, settled out, etc.) We do not expect any defendants to be settled out.
**Evaluation (% chance to win):** 40%
**Estimated Adverse Verdict Range:** (please quantify % chance of verdict in that range). $12 mm - $15 mm
**Estimated Settlement Value:** (please quantify % chance of settlement in that range). It is unlikely that the case will settle for less than $12 million based upon current verdict trends.
**Estimated Trial Length:** 2-3 weeks
**Trial Date:** N/A although it will be specially set.

I.  Executive Summary (no more than five sentences; should contain: central allegations in case, likelihood of prevailing (including percent chance); likely adverse verdict range; likely settlement range; potential for verdict in excess of insured's policy limit(s); and any special considerations (e.g., venue, issues with co-defendants, trial judge, etc.)

Mediation before Gino Brogdon is set for July 25, 2019. Plaintiff made a $64 million demand on 5/17/2019. Dispositive and Daubert motions have been filed by all parties.

This suit alleges a failure to timely diagnose and treat a basilar artery occlusion and brain stem stroke following chiropractic care on the afternoon of 10/26/2015, leaving the plaintiff, Jonathan Buckelew, bed-ridden and locked in. This is a swearing match between Dr. Womack and the consulting neurologist, Peter Futrell, over what he was told in a phone call by Dr. Womack regarding the admitting history and the testing ordered by Dr. Womack and to a lesser extent, between him and the radiologist about whether any calls occurred between them. Based upon the current position of the parties, we believe that there is a

EXHIBIT

F

==40% chance of success.== In the event of an adverse outcome at trial, a verdict range of $12 million to $15 million would not be unexpected. **Assuming 100% liability, we currently see the allocation of fault as 40% for Womack, Futrell and Waldschmidt,** 10% for chiropractors, and 50% for the Hospital, Nickum, and Lavania. We suspect Plaintiff will be unwilling to settle with Womack unless they also settle with Futrell. We cannot see any way that Dr. Waldschmidt will not pay his limits and suspect that the chiropractors will pay close to their limits as well since they could have--but did not--file a motion for summary judgment and also did not file any Daubert motions.

II.    Parties/Forum

   A.   Plaintiff(s)

   - *assessment of witness potential and impact on case current condition (partially/permanently disabled, deceased, etc.)*: Plaintiffs are Jonathan Buckelew and Christin Buckelew. Jonathan Buckelew is locked in, bed-ridden, cannot speak and communicates by blinking. Christin Buckelew was sympathetic, emotional but although they are still married, she no longer lives in the same home as him and has not seen him for months. He is being cared for at the family five-bedroom/five-bathroom home in Roswell. His parents are generally sympathetic but one gets the feeling that they are less than truthful in discussing Jon's drug issues.
   - *date of birth*: 05/24/1983 (Jonathan Buckelew); 01/29/1989 (Christin Buckelew)
   - *age at date of loss*: 32 (Jonathan Buckelew); 26 (Christin Buckelew)
   - *gender*: Male (Jonathan Buckelew); Female (Christin Buckelew)
   - *race/ethnicity*: Caucasian
   - *marital status (then and now)*: Plaintiffs have been married since April 18, 2008 but have not lived together since 2016.
   - *occupation*: At the time of the incident, he was on short-term disability from his job at an IT call center. Although the disability application listed the cause as headaches and anxiety, he was actually in an out-patient detoxification program to wean off the methadone that he had taken for his heroin addiction. He had been on the methadone for approximately 8 years although Christin's testimony was that he relapsed at one point on marijuana.
   - *connection of plaintiff to litigation (estate/guardian ad litem/self)*: Self and wife
   - *beneficiaries (including assessment of impact)*: Wife, Christin Buckelew. No children. **Although there was some suggestion that Christin has filed for divorce, no divorce petition is on file in Fulton County.**
   - *relevant online/social media presence*: None discovered yet.

   B.   Plaintiff's Counsel

   - *Law firm name*: Shamp Jordan Woodward
   - *Individual attorneys involved*: Laura M. Shamp and Joshua F. Silk
   - *Experience/competency (background, ability, known trial experience, experience in this venue)*: Both are experienced attorneys who we anticipate will do an effective job representing the Plaintiffs.
   - *Propensity to try vs. settle cases*: This varies on a case-by-case basis, but we have no reason to doubt these attorneys will try this case if necessary.
   - *Negotiation style*: Mrs. Shamp can be very aggressive.
   - *Propensity to propose/entertain/accept high-low agreements*: Unknown.
   - *Recent trial success/failure including verdict amounts as applicable*: She has obtained success at trial and we think it unlikely that she will associate a trial attorney on this case.
   - *Other special factors that might influence this case*: Mr. Buckelew is being covered by his wife's insurance (CIGNA) although for a period of time, all bills were being paid out of pocket by his parents because his insurer, Mutual of Omaha, disclaimed since he was on disability at the time of the incident.

C.  Insured Defendant(s)

- *Name(s)*: Matthew Womack, M.D. and North Fulton Emergency Physicians, LLC
- *Gender*: Male
- *Race/ethnicity*: Caucasian
- *Practice/Entity name*: North Fulton Emergency Physicians, LLC
- *Specialty*: Board Eligible Emergency Medicine
- *Medical school/residency*: Ross University (Medical School); University of Toledo (Residency)
- *Number of years in practice*: Approximately six months at time of subject accident post-residency.
- *Experience with procedure/treatment at issue*: He was experienced at the time in calling in for consultations and in ordering imaging tests, which is his issue.
- *Assessment of witness potential and impact on case:* He made a good witness although subsequently, after an audit trail was produced of the ED records, he had to provide an errata sheet acknowledging that his note(s) discussing in detail the conversation with Dr. Futrell was charted after he became aware of the adverse result. Plaintiff is now taking the position in pleadings that he "lied" under oath and undoubtedly this will be the subject of a motion in limine. He has consented to settlement.
- *Other special factors (relating individual insured(s) or practice group) that might influence this case*: As will be discussed infra, Dr. Futrell entered a note three days after the event claiming that he was never informed about the chiropractic care, and not informed that a CTA had been ordered or the result. He also charted that he knew he had not been told because he checked his phone records and the call had been over minutes before the CTA result was available. In discovery, Dr. Futrell produced a screenshot which shows the call was 4 minutes, beginning at 18:46. However, the log produced also in discovery contradicts this as the result was available at 18:51 and the call with Dr. Womack was over at 18:52. There was peer review and our understanding is that Dr. Womack was given a letter of concern, based upon Dr. Futrell's note and we suspect that Dr. Futrell may have also received a letter.

D.  Defense Counsel

- John E. Hall, Jr. and Beth W. Kanik

E.  Co-defendants

1.  Peter Futrell, MD and North Fulton Neurology, P.C.

- *Assessment of witness potential and impact on case:* He is a key witness because of the reasons outlined above. He made a fair witness. Dr. Futrell is no longer in the practice and it was not an amiable breakup. While he and Dr. Womack clearly have their differences, the finger pointing was as minimal as possible. **We understand from a private conversation with his counsel that he has still not consented to settlement, although discussions have been underway and pressure is being applied.**
- *Other special factors about co-defendant(s) that might influence this case*: Christin Buckelew testified that Dr. Drexinger, Futrell's former partner, encouraged her to file suit (although they didn't realize that Futrell and his practice would be named). In notes produced by Plaintiff, Dr. Futrell is quoted as claiming that Dr. Womack's note was a lie and that Womack implicitly admitted as much to him.[1] These notes glorify Dr. Drexinger as an advocate and although there was a brief period in which care was transferred, it is now back with him at his practice..
- *Co-defense counsel (for each co-defendant)*: Weathington McGrew, P.C. for Dr. Futrell and Peters & Monyak for the North Fulton Neurology, P.C.

---

[1] He claims that he subsequently confronted Womack, looked at him and could tell by Womack's eyes the he knew he had lied. Dr. Womack's recollection is that by that time, he had retained counsel and was simply trying to avoid answering Futrell, per counsel's instructions.

- *Individual attorneys involved:*  Paul Weathington and Jessica Holland for Dr. Futrell.  Bob Monyak and Austin Ellis have North Fulton Neurology.
- *Experience/competency (background, ability, known trial experience, experience in this venue)*:  Both are experienced attorneys who have experience practicing in this venue.
- *Propensity to try vs. settle cases*:  You are familiar with them from other MMICNC cases.
- *Recent trial success/failure including verdict amounts as applicable that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*:  See discussion above.
- Co-Defendant Information Table

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| Dr. Peter Futrell | Neurologist | North Fulton Neurology, P.C. (Employer) and Mag Mutual and coverage is shared with his practice, NFN. | $2,000,000/$4,000,000 | In case. |

2.  James Waldschmidt, MD and James Waldschmidt, MD, P.C.

- *Assessment of witness potential and impact on case*:  Dr. Waldschmidt made a poor witness.  He claimed to have had two conversations with Dr. Womack—about the normal CT and about the CTA (which Dr. Womack denies).  He agreed that he did not identify the basilar artery thrombus, but did not believe the failure to do so was a breach in the standard of care.
- We have not yet deposed Dr. Waldschmidt, but we will update this portion of our report once
- *Other special factors about co-defendant(s) that might influence this case*:  None at this time.
- *Co-defense counsel (for each co-defendant)*:  Huff Powell & Bailey, LLC
- *Individual attorneys involved*:  Scott Bailey and Michael Frankson
- *Experience/competency (background, ability, known trial experience, experience in this venue)*:  you are familiar with them.
- *Propensity to try vs. settle cases*:  They will try cases, but will also settle out and enter into confidential high-low agreements.
- *Negotiation style*:  See above.
- *Recent trial success/failure including verdict amounts as applicable*:  No recent verdicts of note, although Scott is an experienced trial lawyer who has obtained defense verdicts as well as taken seven-figure verdicts.
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*:  Candidly, the issue is whether we can remove the focus from the Futrell/Womack dispute to the question of the appropriateness of the radiology read. **In light of their unsupportive expert, we expect policy limits to be offered.**
- Co-Defendant Information Table

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| James Waldschmidt, MD | Radiologist | James Waldschmidt, MD, P.C. is his employer, and his | $1,000,000/$3,000,000 | In case. |

| | | insurance is through Mag Mutual (via Roswell Radiology Associates) | | |
|---|---|---|---|---|

3. North Fulton Pulmonary Specialists, LLC, Sachin Lavania, MD, and Christopher Nickum

- *Assessment of witness potential and impact on case*: Chris Nickum is a PA-C who is familiar because he previously was employed as a PA by Independent Physicians Resources, an entity which has an affiliation with Apollo. He made a good witness although the Plaintiff theory was that as a PA, he should not have been managing the ICU. Dr. Lavania made a good witness, but the theory is that he, not a PA, needed to be in charge.
- *Other special factors about co-defendant(s) that might influence this case*: Although there was a suggestion at the time of the last report that heparin use was to be an issue, that appears to be no longer the case. **The issue is the appropriateness of mechanical thrombectomy and TPA.**
- *Co-defense counsel (for each co-defendant)*: Huff Powell & Bailey, LLC
- *Individual attorneys involved*: Brian K. Mathis and David D. Mackenzie
- *Experience/competency (background, ability, known trial experience, experience in this venue)*: Both are experienced attorneys and Brian will point fingers.
- *Propensity to try vs. settle cases*: Please see prior discussion re: Huff Powell & Bailey, LLC
- *Negotiation style*: Please see prior discussion re: Huff Powell & Bailey, LLC
- *Recent trial success/failure including verdict amounts as applicable*: Mr. Mathis recently lost a $7.6 million verdict in Valdosta in a nursing home case (in which he attributed the fault to others than his client).
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*: **Dr. Lavania and Mr. Nickum are insureds under the Hospital policy and it is unclear as to whether or not their consent is required (we were told Dr. Lavania would not consent). Dr. Lavania was a defendant in a case tried in Fulton County that resulted in a verdict against him in excess of his policy limits (subsequently settled for policy limits).**
- Candidly, the intensivist had some interaction with Dr. Drexinger and the family. We also believe that while Mr. Nickum never spoke with Dr. Futrell, he will relay what he was told by Dr. Womack about the conversation. They are insured through the Hospital's policy.

- Co-Defendant Information Table

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| Sachin Lavania, MD | Pulmonology – Board Certified in Internal Medicine | North Fulton Pulmonary Specialists (Employer) and Marsh Services Cayman, Ltd. is the insurance broker. | $25,000,000 per occurrence limit with $5,000,000 self-insured retention shared with practice. $175 million in aggregate). | In case. |

5

| Christopher Nickum | Physician Assistant | North Fulton Pulmonary Specialists (Employer) and Marsh Services Cayman, Ltd. is the insurance broker. | $25,000,000 per occurrence limit with $5,000,000 self-insured retention shared with practice. ($175 million in aggregate). | In case. |
|---|---|---|---|---|

4.  Dr. Robert A. Schlampp, P.C.

- *Assessment of witness potential and impact on case*:  Vicarious liability for the actions of Dr. Axt, the chiropractor.  Dr. Axt made a good witness.
- *Other special factors about co-defendant(s) that might influence this case*:  Observations on Mr. Buckelew and whether he was in fact seizing after the adjustment and whether he was an appropriate candidate for an adjustment.  The family notes suggests that any seizures did not in fact occur (another reason why Dr. Womack was concerned and why the family is critical of Dr. Womack for identifying seizures that they believe did not happen).  Dr. Robert A. Schlampp, P.C. is the entity who Chiropractor Axt's contract was with.  This party was added as a Defendant and **Advanced Integrated Medicine (AIM) recently let out on a consent motion.**
- *Co-defense counsel (for each co-defendant)*:  Carlock Copeland, Semler & Stair
- *Individual attorneys involved*:  Rolfe M. Martin and Michael Diorio
- *Experience/competency (background, ability, known trial experience, experience in this venue)*:  Both are experienced lawyers who have experience in the forum jurisdiction.
- *Propensity to try vs. settle cases*:  Rolfe will be aggressive in pointing fault at the other defendants.
- *Negotiation style*:  We anticipate that they will argue that a lack of proximate cause is present since the neurological issues were identified and EMS called.  We also suspect he will argue that the dissection occurred for reasons unrelated to the adjustment, temporal issues notwithstanding.
- *Recent trial success/failure including verdict amounts as applicable*:  We are familiar with Rolfe.  His discovery responses indicate that he is ready to argue lack of causation and point fingers.
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*:  We suspect he will work with Dr. Axt's attorney in limiting their exposure by pointing fingers at the other defendants.  **Surprisingly, did not file any Daubert motions or file any motion for summary judgment on lack of proximate cause/superseding intervening cause.  This leads us to believe that they will be willing to pay significantly at mediation.**
- Co-Defendant Information Table

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| Robert Schlampf P.C.. | Mixed, but Plaintiff received chiropractic care here. | NCMIC | $1,000,000/$3,000,000 | In case. AIM was dismissed |

5.  Tenet Healthcare Corporation and North Fulton Medical Center, Inc. d/b/a North Fulton Regional Hospital

- *Assessment of witness potential and impact on case*:  No witness has been deposed.

6

- *Other special factors about co-defendant(s) that might influence this case*:  Deep pocket. Tenet has moved to be dismissed, arguing that all of the nurses were employed by the Hospital and that none of the physicians were employed by Tenet. The allegation against the Hospital itself is for the actions of the nurses as well as agency involving Lavania and Nickum.
- *Co-defense counsel (for each co-defendant)*:  Huff Powell & Bailey substituted for Insley and Race after firm dissolved.
- *Individual attorneys involved*:  Brian Mathis, Esq. and David McKenzie, Esq.
- *Experience/competency (background, ability, known trial experience, experience in this venue)*:  Both are experienced attorneys who have experience in the forum jurisdiction.
- *Propensity to try vs. settle cases*:  They will work up the case and then see about settling since Tenet no longer owns this hospital and since Tenet has recently paid seven figures in the confidential settlement in Barnett, another locked-in-stroke case.
- *Negotiation style*:  We think it likely they will try to settle out before trial since this is one of the last cases in which Tenet was involved, prior to the sale to Wellstar.
- *Recent trial success/failure including verdict amounts as applicable*:  Recently took a six-figure verdict in a Wellstar case pending in Fulton County over a patient being dropped from a stretcher. They also represent the hospital in the Barnett case.
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*:  The Hospital remains in the case as the deep pocket defendant even if Tenet is dismissed.
- *Co-Defendant Information Table*

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|---|---|---|---|---|
| North Fulton Medical Center, Inc. d/b/a North Fulton Hospital | N/A – Hospital | Entity is owned by Tenet Healthcare Corp., and insurer is Marsh Management Services Cayman, Ltd | $25,000,000 per occurrence with unlimited aggregate with a $5,000,000 self-insured retention and $175 **million in aggregate** | In case. |
| Tenet Healthcare Corporation | N/A | See Number 7 in Section XIII below for a more detailed explanation as to this entity. | See Number 7 in Section XIII below for a more detailed explanation as to this entity. | In case. |

6. Michael Axt

- *Assessment of witness potential and impact on case*:  He made a good witness.  He had no involvement with your insured's role.
- *Other special factors about co-defendant(s) that might influence this case*:  Not at this time.
- *Co-defense counsel (for each co-defendant)*:  Coleman Talley
- *Individual attorneys involved*:  M.B. Satcher, III and Emily E. Macheski-Preston
- *Experience/competency (background, ability, known trial experience, experience in this venue)*:  Both are experienced attorneys with litigation experience in the forum venue.
- *Propensity to try vs. settle cases*:  See prior discussion re: Rolfe Martin.  They will be in lock-step.
- *Negotiation style*:  See prior discussion on causation.

- *Recent trial success/failure including verdict amounts as applicable*:  Mr. Satcher recently obtained a defense verdict for a chiropractor in a conservative jurisdiction in 2017.
- *Other special factors that might influence this case (e.g., ability to control clients, likelihood of mounting united defense cooperation vs. finger pointing/retaining experts against co-defendants, etc.)*:  See prior discussion regarding Rolfe Martin and **the fact that no dispositive motions or Daubert motions were filed.**
- *Co-Defendant Information Table*

| Name | Specialty | Employer & Insurer | Applicable Insurance Limits | Status (in case/ settled/dismissed) |
|------|-----------|--------------------|-----------------------------|-------------------------------------|
| Michael Axt | Chiropractor | Employed by Dr. Robert A. Schlampp, P.C., and his insurer is NCMIC | $1,000,000 per occurrence / $3,000,000 aggregate | In case. |

## F.  Trial Judge

- *Trial judge name, gender, race/ethnicity*:  Judge Eric Richardson, Male, African American
- *Assessment of trial judge's likely impact on case*:  We anticipate Judge Richardson will fairly preside over this matter.
- *Recent noteworthy verdicts/hearings/rulings involving this judge*:  We are familiar with him because he is also the judge in <u>Barnett</u>, another locked in stroke case.
- *Is the judge known to be plaintiff or defense oriented?*  He is not as plaintiff oriented as other judges in Fulton County although large verdicts have been obtained in his courtroom.

## G.  Venue

- *Location*:  Fulton County, Georgia
- *Court name*:  Fulton County State Court
- *Plaintiff or defense oriented*:  Plaintiff
- *Demographics of likely jurors*:  46.1% White; 44.5% African American; 7.3% Latino; and 7.0% Asian; 16% poverty rate; 91.3% high school graduate or higher; 49.8% hold bachelor's degree or higher.
- *How many jurors will be seated for trial?*  Twelve (12)
- *May we insist upon a unanimous verdict?*  Yes.  *Why not? If not, what is the majority required to obtain a verdict?*  N/A
- *Outcome(s) of recent relevant trial(s) in venue including verdict amounts as applicable*:  None on locked-in syndrome; however, last year there was a $45.6 million verdict involving a woman purportedly caused brain damage at Northside Hospital.  Dan Huff represented the named physician defendant and the practice after the hospital settled out.
- *Is bifurcation permitted?*  Yes pursuant to O.C.G.A. § 9-11-42.  *If so, do you recommend pursuing bifurcation in this case?*  Not in this case.
- *Is there an arbitration agreement that does/will apply?*  No.
- *What local rules are in place that will affect presentation of evidence (e.g., number of expert witnesses), length of trial, and/or outcome (e.g., contributory negligence, comparative negligence)?*  Georgia Evidence Code will govern.  Georgia is a modified comparative negligence state.
- *How will settlements of co-defendants (before verdict) be treated in the event of a plaintiff's verdict against our insured(s)?*  They can be listed for purposes of apportionment on any verdict form.
- *What questions will be asked on the jury verdict form?*  Liability, apportionment, and damages
- *How will the jury apportion negligence among co-defendants?*  See prior discussion.

8

H.  Insured's Personal Counsel

- *Recommended to insured?*  Discussed and Insured is aware.
- *Why/why not?*  In light of the risk of an excess verdict.

III.    Incident (complete recitation of all relevant facts)

- *Relevant treatment that took place before care at issue*:  Plaintiff Jonathan Buckelew was aged 32. Purportedly, he had a two-week history of fevers and headaches after he had been in a detoxification program run by Dr. Bergeron in Roswell.  Jon had been on methadone for 8 years following his heroin addiction.  His mother recommended that he see her chiropractor Dr. Axt for his neck pain after working out at the gym.

- *Treatment at issue (including location(s)/date(s)):*  Chiropractor Axt indicates that he adjusted Mr. Buckelew's neck while Mr. Buckelew was lying down and then asked Mr. Buckelew to sit up. Chiropractor Axt noted that when Mr. Buckelew sat up, he reported that he felt dizzy and seemed disoriented.    Mr. Buckelew's left pupil was dilated and that Mr. Buckelew appeared dazed. Mr. Buckelew was still oriented.  Chiropractor Axt left to get help.  When he returned, Mr. Buckelew appeared less responsive.   William Almon, MD,[2] who was a practitioner at Advanced Integrative Medicine, dictated notes.  In his notes, he describe Mr. Buckelew's eyes as open but that he was unresponsive and asymmetry of his pupils with left greater than right.  Amon suspected an aneurysmal bleed.  EMS was called.

  Mr. Buckelew was transported by ambulance to North Fulton Hospital where he arrived at approximately 4:20 p.m. which is approximately 20-30 minutes following the event.

  Mr. Buckelew's primary ED physician was your insured, Dr. Matthew Womack.  In the initial notes, the GCS assigned was an 11.  Soon thereafter, Mr. Buckelew's mother, Janice arrived and she was the primary historian while Jon was in the ED.  His father and brother and sister-in-law arrived thereafter and his wife, Christin arrived at around the time he was being transferred to the ICU.

  Dr. Womack's notes indicate that his family told him that Mr. Buckelew was slowly weaned off methadone by a local doctor using Xanax and that Mr. Buckelew had complained about a headache earlier in the morning and was acting "somewhat abnormal" according to his mother.  There was no history of prior seizures but that Mr. Buckelew was on Dilantin sometime prior to the date of the subject accident to help him wean off Methadone but that he was not taking anti-seizure medication on the date of the subject incident, per his mother.  She denied giving this history at her deposition.

  At 4:39 p.m., Dr. Womack ordered a CT of the brain and a CTA of the neck.  Between the time that Dr. Womack saw Mr. Buckelew and the time that the CT and CTA were performed, a new trauma patient arrived who was prioritized over Mr. Buckelew in terms of having the diagnostic imaging performed for approximately 30 minutes.

  The CT was read by co-defendant radiologist Dr. Waldschmidt as showing no hemorrhage or acute ischemic event or mass covering lesion.  The  CTA was also read by Dr. Waldschmidt.  The clinical indication listed by Dr. Womack for the CTA study was "pain/dissection."

  On the CTA, Dr. Waldschmidt's impression was:

---

[2] Dr. Almon is no longer employed.  He was recently featured in an investigation performed by the *Atlanta Journal-Constitution* on doctors accused of sexual abuse that may create credibility and character issues if he is called as a witness.  More detailed information can be found here: http: //doctors.ajc.com/georgia_doctor_sex_abuse.  Rolfe Martin has told us that he does not know his location and will avoid having to produce him.

1. Very small caliber of right vertebral artery intermittently identified over its expected course. This may be due to normal congenital variation of dominant left vertebral system or may represent sequelae of age-determinate dissection. Right vertebral artery does not contribute to formation of basilar artery.
2. Normal radiographic appearance of left vertebral artery.
3. Normal radiographic appearance of common carotid arteries, and extracranial internal carotid arteries.

The report was dictated and finalized/authenticated at 16:51.

Dr. Womack used a scribe in the ED. This note at issue states:

10/26/2015 18: 50: 00, FUTRELL, MD. PETER R. phone call, consult. Physician recommends LP. Wants hospitalist to admit. Discussed normal head CT and finding of age indeterminate dissection vs. congenital variation with him. As the basilar artery was filling normally this was not felt to be an acute finding. (This note beginning with "Discussed" was added on 10/27 and we have produced an errata sheet).

At 19:09, Dr. Womack updated the family on the CT results and plan for an LP.

At 19:20, Dr. Womack went to set the pt up for the LP. Dr. Womack noted, "pt had another seizure witnessed by myself. Will change status to epilepticus. Family updated on status."

The LP was performed at 19:48. Indication was listed as headache, possible meningitis, neurologic workup. It was collected at 20:11.

At 20:07, Christopher Nickum PA was called to consult. He was the PA-C in the ICU. He agreed to admit to the ICU for Dr. Lavania, the intensivist.

Our understanding is that Dr. Womack went off shift shortly thereafter.

PA Nickum's admitting H&P note is timed at 20:37. It references the following significant information:

Radiographic data: CT scan of head, noncontract, reveals no radiographic evidence of acute hemorrhage, stroke or intracranial masses. Subsequent CT angio of neck performed which was identified over its expected course. Felt to be due to normal congenital variation of dominant left vertebral system or may possible be sequelae of age-indeterminate dissection.

The plan was to consult ID if the spinal fluid was suspicious for meningitis. He was febrile in the ICU and under the care of the PA, Nickum. He was given cooling blankets and Tylenol in an effort to reduce his fevers which rose to as high as 106 degrees.

The results of the analysis from the CSF was available at approximately 21:00. It was negative.

Dr. Lavania added to the note with an "attending note" that stated, "Pt. seen and examined, all labs and imaging reviewed. Pt hypothermic with normal appearing CSF studies morning of 10/27. Currently intubated and sedated. Will send for MRI brain along with MRA neck and brain. Neurology consulted by ED physician on presentation to ED. ID also consulted. Will f/u on MRI/MRA results."

At 10:55 a.m. on 10/27, Dr. Lavania charted "have reviewed the CTA with radiology/multiple radiologists this a.m., in respect to right vertebral artery. Pt was at chiropractors yesterday. Will proceed with MRI/MRA brain now. At approximately the same time, Dr. Drexinger, who was then Dr. Futrell's partner, was involved in the care.

At 12:00, the MRA of the head w/o contrast was reviewed and the impression was of:
1. marked abnormal appearance of basilar artery with little if any flow at that site;
2. Distal right vertebral artery not visualized;
3. Dim unitive bilateral posterior cerebral arteries.

We understand that efforts to have him transferred to Grady were unsuccessful because it was thought that too much time had passed.

**Dr. Futrell's note on 10/29 timed at 14: 40 states as follows:**
**This note is to clarify the discussion between Dr. Womack & myself while pt. was in ER on evening of 10/26/15. Despite his documentation, we did not at any point discuss the CTA & in fact I was not aware the pt. had CTA until 2 days later, at approx. 1400 on 10/28/15 (in reviewing the records and my phone log, the CTA results were not even available until after 1851 that evening & our conversation took place a few minutes prior to that time). What I was told by Dr. Womack was that the pt. presented with fever, seizure, not feeling well for several days prior & was given doxycycline from family member (of note, there was no mention of pt. seeing chiropractor).** My recommendation commented that encephalitis or meningitis was a concern given hx. It is my understanding that the LP performed & that pt. also experienced another seizure in ER but I was not contacted with CSF results nor was I notified of recurrent seizure.

- *Relevant treatment that took place after care at issue*: He was admitted to Landmark in Athens and then to the Shepherd Center. Currently, his parents are caring for him at the family home.
- *Alleged causal connection between care at issue and patient's injury*: See discussion above although we believe now that the causation issue involves the question of whether or not he would have been a candidate for thrombolytics or a thrombectomy and whether thrombectomy was standard of care in 2015.
- *Any other relevant facts (break down by category)*: See discussion above regarding Dr. Womack and Dr. Futrell as well as the discussion on the radiology.
- *Patient's current condition (if patient is deceased, state so)*: See discussion above.
- *Patient's prognosis and life expectancy*: We have retained Robert Shavelle, Ph.D. to discuss life expectancy.

IV. Issues/Allegations/Nature of Dispute

- *Liability (including each chargeable component: negligence, gross negligence, willful/wanton/fraud)*: We suspect that this will be a gross negligence case as to your insured but have asked that the Court apply 51-1-29.5 as a matter of law. We have also moved to dismiss North Fulton Emergency Physicians, LLC on grounds that Dr. Womack was an independent contractor.

  Defendant Futrell and North Fulton Neurology have moved for summary judgment, arguing that no physician-patient relationship existed between Buckelew and Dr. Futrell through the phone conversation with Dr. Womack.

  Plaintiff has filed a spoliation motion because the Hospital cannot produce a complete audit trail as to Nickum and Lavania (although was produced with respect to Womack).

- *Causation issues*:

  1. Lack of proximate cause/superseding cause as to all defendants and whether outcome could have been changed.

     - *Any affirmative defenses*: Yes.
     - *Statute of limitations defense*: None.
     - *Statute of repose defense*: None.

11

V.    Discovery/Activity Completed to Date - Excluding expert opinions, but including though not limited to:

- *Discovery exchanged*: **Discovery and expert depositions have been completed.**
- *Investigative activity*:  Not at present.
- *Audit trail of EMR and/or VOIP (phone system) obtained/produced? If no, why not?* **The original audit trail did not impact Dr. Womack although a subsequent one produced in November did so and we prepared an updated errata sheet.**
- *Preservation accomplished? If no, why not?* N/A as to your insured.
- *Investigation of insured's phone/tablet/email account content that could be applicable. If no, why not?* We have provided Dr. Futrell's phone log that was produced in his discovery responses.  N/A as to your insured.
- *Significant EMR problems/issues*: **See discussion regarding Womack/Futrell notes.  Dr. Futrell has not located any records to clarify the timing issues created by the screen shot vs. Verizon log (although he said that they were being searched for).**
- *Have relevant practice policies/procedures been obtained and how do they impact case? If no, why not? Unknown at present.*
- *Have relevant provider schedules been obtained and how do they impact case? If no, why not?* Yes, the schedules have been obtained and show that Dr. Womack was working 10 a.m. - 8 p.m. on 10/26.
- *Are non-medical experts appropriate/recommended (e.g., Forensic IT, ACA, billing/coding specialist, annuitist, private investigator, etc.)? If no, why not?* **Life expectancy issues/ competing experts and Daubert motions (we have moved to exclude Plaintiff's life expectancy expert and they have moved to exclude our life expectancy expert).**
- *Recommendations for additional research*:  None at present.

VI.    Experts

A. ¯Plaintiff's Experts

1.    Jennifer Adamski, DNP, APRN, ACNP-BC, CCRN

- *Specialty (medical or non- medical)*:  Nursing
- *Standard of care, causation, and/or damages, or non-medical opinions*:  The nurses at North Fulton Hospital deviated from the standard of care by not following policies and procedures involving the taking of vital signs, in neurological checks, in and in notifying a physician when Mr. Buckelew's condition changed overnight on the evening of October 26, 2015 through the morning of October 27, 2015, in particular that Mr. Buckelew's pupils were sluggish and that his blood pressure and heart rate were both elevated.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:  Nurse Adamski was a nursing professor at Emory University who relocated to Ohio because of her husband's job.  She is a novice at testifying, but made a good witness although somewhat rigid in her opinions.

2.    Craig Baumgartner, PA-C

- *Specialty (medical or non- medical)*:  Physician's Assistant
- *Standard of care, causation, and/or damages, or non-medical opinions*:  Christopher Nickum deviated from the standard of care by not consulting with Dr. Lavania after seeing the patient, by not considering and ruling out a vascular cause of the patient's symptoms, i.e., a vertebral artery dissection, by not reviewing the results of the CSF studies and at that time consulting with Dr. Lavania to discuss a potential vascular cause of the patient's symptoms.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:

12

Mr. Baumgartner has been working as a PA-C since 1994 and testifies frequently. He is based in Chicago.

3.  Aaron Waxman, MD

  - *Specialty (medical or non- medical)*: Pulmonary and Critical Care Medicine
  - *Standard of care, causation, and/or damages, or non-medical opinions*: The PA, Nickum, deviated from the standard of care by not contacting Dr. Lavania sooner. Dr. Lavania deviated from the standard of care by not considering and ruling out a vascular cause of Mr. Buckelew's symptoms when he was consulted and beginning heparin. Dr. Waxman's criticism of Dr. Lavania was in not acting sooner to heparinize Mr. Buckelew based upon the findings on CT/CTA, the autonomic instability, the CSF result, and the clinical history. He did not feel that it was necessary to wait for an MRI/MRA and that the vertebral artery dissection and brain stem stroke should have been diagnosed sooner. He believed that if heparin had been initiated at any time prior to the MRI/MRA even as late as the morning of 10/27, Mr. Buckelew would be able to enjoy the activities of daily living (ADL) and would only be minimally impaired. **We suspect that this opinion on heparin will not be utilized at trial.**
  - *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Dr. Waxman is at Harvard now although trained at Yale. At his deposition, he acknowledged that approximately 2/3 of his deposition testimony is on behalf of plaintiffs and 25% to 30% of his annual income is from medical-legal work. He was a careful witness and experienced.

4.  Romanus Roland Faigle, MD

  - *Specialty (medical or non- medical)*: Neurologist. Not deposed yet.
  - *Standard of care, causation, and/or damages, or non-medical opinions*: Dr. Futrell deviated from the standard of care by not considering and ruling out a basilar thrombosis in the setting of a vertebral artery dissection in Mr. Buckelew. Dr. Futrell should have reviewed the imaging studies himself. He believed that either TPA and then Thrombectomy should have been utilized and would have made a difference in the outcome but was vague on the likelihood of success.
  - *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Dr. Faigle is an Assistant Professor of Neurology at The Johns Hopkins University School of Medicine.

5.  Anthony Mancuso, MD

  - *Specialty (medical or non- medical)*: Radiology. Not deposed yet.
  - *Standard of care, causation, and/or damages, or non-medical opinions*: **Dr. James Waldschmidt deviated from the standard of care by not appreciating an indisputable, acute or subacute vertebral basilar artery occlusion due to a vertebral-basilar dissection on the October 26, 2016 CTA for Mr. Buckelew.** He felt that the dissection involved both the right and left arteries and should have been identified as such, including its size.
  - *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: He testified for the plaintiffs in the Barnett case and is mostly a plaintiff's expert.

13

6. Martin Lutz, MD

- *Specialty (medical or non- medical)*: Emergency Medicine. Deposed.
- *Standard of care, causation, and/or damages, or non-medical opinions*. He was critical of your insured for failing to ask Dr. Futrell to come in and see the patient in their conversation at 18:50. If one assumes that Dr. Futrell was told what is stated in the note and in Dr. Womack's testimony, Dr. Lutz still believed that Dr. Futrell could not be relied upon to make his own determination about seeing the patient and it was up to Dr. Womack to ask him to do so. Dr. Lutz testified that this was a criticism which he had at the time he signed the Affidavit, and did not list it because there was no legal duty to do so (all he had to do was list one criticism).

  Dr. Lutz was also critical of Dr. Womack for failing to call Dr. Futrell back when: a) the patient had the seizure so as to tell Futrell of the change in condition and b) when the CSF fluid looked clear. In Dr. Lutz's opinion, had the call(s) been made, then Dr. Futrell would have come to the hospital. Dr. Lutz acknowledged, that the LP cultures were not available at the time Dr. Womack left the Hospital that night.

  He was also critical of Dr. Womack for failing to contact Dr. Lavania at the time of the transition of care to the intensivists. He did not believe that Mr. Nickum, as a PA, was competent to manage a patient like Mr. Buckelew. Dr. Lutz agreed that there is no PA coverage of the ICU at his hospital.

  Dr. Lutz believed that the standard of care required dissection to be first/high up on the differential recorded in the medical record at the 16:27. However, he acknowledged that the ordering of the CT w/o contrast and the CTA were appropriate in a patient whom dissection was suspected (and that the listing in the differential did not more likely than not, lead to the outcome).

  He was critical of what he saw as inadequacies in the history taken by Dr. Womack because it lacked specificity about the drug detoxification details (how long Mr. Buckelew had been weaned off of methadone), as well as other medications that Mr. Buckelew had been on. He also believed that the physical examination was inaccurate, although again he acknowledged that neither played any part in the eventual outcome.

  He acknowledged that it is atypical in his practice for a radiologist to contact an ER physician with a normal CT of the head without contrast unless a stroke alert was called. He believed that it was appropriate for a radiologist to call if there was an abnormal study. He also identified the note by Dr. Futrell on 10/29 as unusual.

- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: He testifies primarily for plaintiffs and admitted that he purposely left out opinions in his affidavit because he knew he could under Georgia law.

7. William J. Lauretti

- *Specialty (medical or non- medical)*: Chiropractor. Deposed.
- *Standard of care, causation, and/or damages, or non-medical opinions*: Chiropractor Lauretti is of the opinion that Chiropractor Axt violated accepted chiropractic practices by not taking a complete history and performing a complete work-up. Vertebral artery dissection should have been on Dr. Axt's differential before the adjustment, and if so, no adjustment would have

14

occurred. He believes that there was an ongoing dissection prior to the adjustment which was made worse by Dr Axt.

- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Mr. Lauretti has been serving as an Associate Professor of Chiropractic Clinical Sciences at New York Chiropractic College since 2005 and includes that he has been an expert witness in cases since 1998. He is registered with an expert witness service.

8. Cathy Gragg-Smith

- *Specialty (medical or non- medical)*: Life Care Planner. Plaintiff has now done an updated life care plan (in the 5/17 demand) that has the costs at $15 million - $36 million depending on whether Jonathan is continued to be cared at home or is sent to a long term care facility.
- *Standard of care, causation, and/or damages, or non-medical opinions*: She believes that 24/7 care will be required and that if the family can no longer do so, Jonathan will need to be transferred to a long-term care facility for what is projected as a normal life expectancy.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Frequent witness.

9. Payal Fadia, M.D.

- *Specialty (medical or non- medical)*: Physiatrist used by Plaintiff on Life Expectancy. Deposed.
- *Standard of care, causation, and/or damages, or non-medical opinions*: She testified that Jonathan will live into his 70s (so shortened life expectancy by 4-7 years). She had no literature to support her opinions. We have filed a Daubert motion to exclude.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Saw Jonathan twice in treatment.

10. Sebastian Koch, M.D.

- *Specialty (medical or non- medical)*: Neurologist/Rebuttal expert. Deposed.
- *Standard of care, causation, and/or damages, or non-medical opinions*: He disagrees that Jonathan was locked in while in the ED and was critical of Dr. Futrell on SOC. He believed that if TPA and Thrombectomy had been given/performed then Jonathan would have had a better outcome. A motion to exclude his opinions has been filed by Dr. Futrell's counsel because Dr. Koch did not review any of the opinions he was retained to rebut but rather was a back-door-expert in the case in chief for Plaintiff.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*: Austrian accent, obtained through an expert witness service.

B.  Defense Experts

1.  Standard of Care Emergency Department Review

- *Name*:  Matthew DeLaney, MD
- *Specialty (medical or non- medical)*:  Board Certified in Emergency Medicine
- *Standard of care, causation, and/or damages, or non-medical opinions*: Supportive. Initially, we spoke to him about heparin and he did not see this as a case in which heparin would be utilized/make a difference. We will follow-up with him on Lutz and Waxman opinions when the transcripts are received.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:  Dr. DeLaney is an assistant residency program director at the University of Alabama (Birmingham) School of Medicine.

2.  Neurosurgeon (Causation)

- **Name:  John Sampson, MD**
- **Specialty (medical or non- medical):  Neurosurgeon. Disallowed by the Court due to scheduling issue and we cross-designated co-defendant experts Frankel and Pikus. Plaintiff is not allowed to criticize Dr. Frankel's credentials or competency or argue that neurosurgeons are not competent to opine on causation.**
- **Standard of care, causation, and/or damages, or non-medical opinions:  Causation** *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.):*

3.  Standard of Care Emergency Department Review

- *Name*:  William Barsan, MD
- *Specialty (medical or non- medical)*:  Emergency Medicine
- *Standard of care, causation, and/or damages, or non-medical opinions*:  Dr. Barsan is supportive of Dr. Womack.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:  Dr. Barsan is a Professor of Emergency Medicine at the University of Michigan School of Medicine.

- *Name*:  Byron Thompson, MD
- *Specialty (medical or non- medical)*:  Emergency Medicine/ Piedmont Hospital
- *Standard of care, causation, and/or damages, or non-medical opinions*:  Dr. Thompson is supportive of Dr. Womack.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.)*:  Local physician.

4.  Damages(Life Expectancy)

- *Name*:  Robert Shavelle, Ph.D.
- *Specialty (medical or non- medical)*: Non-Medical (Life expectancy)  Deposed.
- *Standard of care, causation, and/or damages, or non-medical opinions*: Testified on the limited life expectancy of a person (ten years) who is ventilator dependent, feeding tube dependent, bed bound, and cannot control secretions.

- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.):* He testifies frequently on this topic. **Plaintiff has moved to exclude these opinions on Daubert.**

C.  Co-Defendant's(s) Experts

- *Name:* Joseph Govert, M.D.—Deposed.
- *Specialty(medical or non-medical).* Intensivist at Duke
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Supportive of Dr. Lavania and Nickum on SOC. He did not believe that a negative LP should have led to a repeat call to the neurologist and believed that the CTA was appropriately ordered (so no difference in the outcome even if one assumes that Dr. Futrell was not given the history by Dr. Womack).
- *Any relevant background information on this expert (including but not limited to **any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).*** Strong witness. **Plaintiff has moved to exclude his opinions on Daubert (and summary judgment).**

- *Name:* Christopher Russell, M.D.- Deposed.
- *Specialty(medical or non-medical).* Neurologist at Peachtree Neurological Clinic (Atlanta)
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Supportive of Dr. Futrell on standard of care. Testified that Dr. Futrell met the standard of care, even if you believe Dr. Womack's side (because the SOC was to order a CTA and the CTA was ordered).
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).* Credibility harmed by the fact that he is currently reviewing four other cases for Weathington McGrew at this time. **Plaintiff has moved to exclude his opinions and then summary judgment.**

- *Name:* Harold Pikus, M.D.
- *Specialty (medical or non-medical).* Neurosurgeon at Dartmouth (Lebanon, NH)
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Supportive on causation.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).* We cross-designated.

- *Name:* Mark Cotney, DC.
- *Specialty (medical or non-medical).* Chiropractor
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Supportive of Dr. Axt, also offered causation opinions regarding chiropractic care.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).* Motion to exclude filed by Plaintiff.

- *Name:* Richard Cole, DC
- *Specialty (medical or non-medical).* Chiropractor in Memphis
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Supportive of Dr. Axt on standard of care. Testified on causation regarding chiropractic care.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).* Motion to exclude causation opinions filed by Plaintiff.

17

- *Name:* David Carpenter, PA-C- Deposed.
- *Specialty (medical or non-medical).* PA at Emory
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Supportive of Chris Nickum on standard of care and that a PA can manage the ICU in the evening.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).* Although he admitted that if one applies the letter of the bylaws, Nickum should not have been in charge of the ICU. However, he freely admitted that there are policies and procedures which in place at Emory are routinely not followed. Motion to exclude all opinions filed by Plaintiff.

- Name: Marc Kaye, M.D.
- *Specialty (medical or non-medical).* Radiologist
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Testified that Dr. Waldschmidt deviated from the standard of care. So no supportive expert for Dr. Waldschmidt.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).*

- Name: Linda Lane, R.N.
- *Specialty (medical or non-medical).* Nurse. Emory
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Testified that ICU nurses met the standard of care.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).* Plaintiff has moved to exclude her opinion/summary judgment

- 
- Name: Bruce Frankel, M.D.
- *Specialty (medical or non-medical).* Neurosurgeon/ Charleston
- *Standard of Care, Causation, and/or Damages, or non-medical opinions.* Testified that since Jonathan was locked-in in the ED, that his outcome would not have changed through either TPA or Thrombectomy.
- *Any relevant background information on this expert (including but not limited to any significant CMS open payments data, any significant CMS utilization data, testimonial history, if known to be a below-average/average/above-average witness, etc.).* We have cross-designated him.

VII.   Deposition Tracking - Update table quarterly.

*Note: The following charts only reflect depositions that have been scheduled. We will supplement and update these charts as additional depositions are scheduled.*

| Deponent's Name | Initially Scheduled Date | Currently Scheduled Date | Completed Date | Date Summary sent to MMICNC |
|---|---|---|---|---|
| Matthew Womack, MD | 03/09/2018 | 03/09/2018 | 3/9/2018 | 3/12/2018 |
| James Waldschmidt, MD | 03/08/2018 | 03/08/2018 | 3/8/2018 | 3/9/2018 |
| Michael Axt, D.C. | 03/01/2018 | 03/01/2018 | 5/17/2018 | 5/22/2018 |
| Peter Futrell, MD | 03/02/2018 | 03/02/2018 | 3/2/2018 | 3/12/2018 |
| Bernard R. Drexinger, MD | 03/01/2018 | 03/01/2018 | 3/1/2018 | 3/12/2018 |

| | | | | |
|---|---|---|---|---|
| Jack Buckelew (Father) | 02/08/2018 | 4/25/2018 | 4/25/2018 | 4/26/2018 |
| Janice Buckelew (Mother) | 02/08/2018 | 2/8/2018 | Not completed | |
| Christin Buckelew (Plaintiff Wife) | 02/08/2018 | 02/08/2018 | 02/08/2018 | 2/19/2018 |
| Christopher Nickum, PA | 5/3/2018 | 5/3/2017 | 5/3/2017 | 5/7/2017 |
| Sachin Lavania, MD | 5/8/2018 | 5/8/2018 | 5/8/2018 | 5/9/2018 |
| Adam Waxman, MD | 8/17/2018 | 8/17/2018 | 8/17/2018 | 8/17/2018 |
| Christopher Baumgartner, PA | 8/24/2018 | 8/24/2018 | 8/24/2018 | 8/27/2018 |
| Jennifer Adamski, R.N. | 8/21/2018 | 8/21/2018 | 8/27/2018 | 8/27/2018 |
| Cathy Gragg- Smith | 10/19/2018 | 10/19/2018 | 10/19/2018 | 10/31/2018 |
| Anthony Mancuso, MD | 10/26/2018 | 10/26/2018 | 10/26/2018 | 10/31/2018 |
| Mike Daniels, Ph.D | 10/22/2018 | 10/22/2018 | 10/22/2018 | 11/2/2018 |
| Romanus Faigle, M.D. | 11/15/2018 | 11/15/2018 | 11/15/2018 | 11/19/2018 |
| William Lauretti, DC | 10/11/2018 | 10/11/2018 | 10/21/2018 | 10/24/2018 |
| Christopher Russell MD | 1/9/2019 | 1/9/2019 | 1/9/2010 | 1/6/2019 |
| Joseph Govert, MD | 12/18/2018 | 12/18/2018 | 12/18/2018 | 12/18/2018 |
| David Carpenter, PA | 12/20/2018 | 12/20/2018 | 12/20/2018 | 12/21/2018 |
| Linda Lane, RN | 11/7/2018 | 12/5/2018 | 12/5/2018 | 12/19/2018 |
| Matthew DeLaney, MD | 2/18/2019 | 2/18/2019 | 2/18/2019 | 2/20/2019 |
| Byron Thompson, M.D. | 2/21/2019 | 2/21/2019 | 2/21/2019 | 2/26/2019 |
| Bruce Frankel, M.D. | 3/1/2019 | 3/1/2019 | 3/1/2019 | 6/6/2019 |
| Harold Pikus, M.D. | 4/5/2019 | 4/5/2019 | 4/5/2019 | 4/15/2019 |
| William Barsan, M.D. | 2/11/2019 | 3/13/2019 | 3/13/2019 | 3/14/2019 |
| Sebastian Koch, M.D. | 5/16/2019 | 5/16/2019 | 5/16/2019 | 5/20/2019 |
| Payal Fadia, M.D. | 4/3/2019 | 5/1/2019 | 5/1/2019 | 5/2/2019 |
| 30 (b) (6) witnesses for North Fulton Medical Center | 5/23/2019 | 5/23/2019 | 5/23/2019 | 5/24/2019 |
| Vallery Tolliver, R.N. | 4/22/2019 | 4/22/2019 | 4/22/2019 | 4/22/2019 |
| Robert Shavelle, Ph.D. | 2/26/2019 | 2/26/2019 | 2/26/2019 | 2/28/2019 |

Depositions Costs Estimate – Fact (F), Plaintiff Experts (PE), Co-Defendant Experts (CE)

| Deponent's Name | Type of Witness (F, PE, CE) | Estimated expense[1] for live attendance | For out-of-state depositions, estimated expense[2] for videoconference attendance |
|---|---|---|---|
| Christin Buckelew | F | $2,500 | Not applicable |
| Janice Buckelew | F | $2,500 | Not applicable |
| Jack Buckelew | F | $2,500 | Not applicable |
| Bernard R. Drexinger, MD | Treating Doctor | $4,000 | Not applicable. |
| Peter Futrell, MD | Treating Doctor | $4,000 | Not applicable. |
| Michael Axt, D.C. | Treating Chiropractor | $2,500 | Not applicable. |
| James Waldschmidt, MD | Treating Doctor | $2,500 | Not applicable. |
| Matthew Womack, MD | Treating Doctor | $2,500 (including prep) | Not applicable. |
| Adam Waxman, M.D. | PE | $2500 | Attended by VC |
| Craig Baumgartner | PE | $2500 | Attended by VC |
| Donna Adamski | PE | $3,000 | N/A |
| Joseph Govert, MD | CE | $2000 | Attended by Phone |
| William Lauretti, DC | PE | $2000 | Attended by phone |
| Linda Lane, RN | CE | $2000 | |
| Anthony Mancuso, MD | PE | $3,000 | |
| Christopher Russell | CE | $3000 | |
| Cathy Gragg-Smith | PE | $4000 | |
| Mike Daniels, PH.D | PE | $2500 | |
| David Carpenter, PA | CE | $2500 | |

| | | | |
|---|---|---|---|
| Martin Lutz, MD | PE | $4000 | |
| Romanus Faigle, MD | PE | $4000 | |

[1] Expense includes total attorney fees and travel expenses

[2] Expense includes total attorney fees, travel expenses, and videoconference fees

Defense Experts

| Expert's Name | Specialty | Hourly Rate | Estimated Expert Fees | Estimated Atty fees & expenses for deposition |
|---|---|---|---|---|
| Matthew DeLaney, MD | Emergency Medicine Standard of Care | $350/hour | $20,000 - $30,000 | $2,500 - $5,000 |
| **Bruce Frankel, MD** | **Neurosurgeon (cross designated)** | | | |
| **Harold Pikus, MD** | **Neurosurgeon (cross-designated)** | | | |
| William Barsan, MD | Emergency Medicine Standard of Care | $350/hour | $15,000 - $20,000 | $2,500 - $4,000 |
| John Sampson, MD | Neurosurgeon/Causation | $600/hour | $20,000 - $30,000 | $2,500 - $4,000 |
| Byron Thompson, MD | Emergency Medicine Standard of Care | $350/hour | $20,000 - $30,000 | $2,000 - $3,000 |
| Robert Shavelle, Ph.D | Damages/ Life Expectancy | $500/hour | $10,000 - $15,000 | $3,500 - $5,000 |

VIII.   *Stage of Proceeding (mediation-including identity and assessment of mediator, trial date, position on calendar and likelihood of being reached, settlement discussions)* – **Mediation set for 7/25/2019.**

IX.   *Significant Evidentiary or Procedural Factors (motions)* – See discussion regarding causation and Daubert motions filed.

X.   Damages (detailed assessment of all chargeable components, economic and non-economic, lien issues)

A.   Economic Damages*

| | Amount Claimed | | Amount we likely owe if liable |
|---|---|---|---|
| Current Medicals | $ 3,977,930.53 | | $ |
| Future Medicals (LCP) | $15,779,669 - $36,724,367 | | $ |
| Wage Loss | $ | | $ |
| Future Wage Loss | $4,000.000 | | $ |
| Miscellaneous | $ | | $ |
| Total Specials | $19,757,599- $40,702,297 (up to age 77 in LTC) | | $ |

**No lien has been reported to date although we anticipate one exists.**

- *Does plaintiff have a life care plan? Has it been produced?* Yes. It anticipates Jon either being cared for at home or in a facility on a 24/7 basis.

- *Does plaintiff have an economist's report?* Yes. Depending on the location of the care, it ranges from a minimum of $15 mm to $36 million and assumes a life expectancy into the 70s. However, we will be able to reduce it through our life expectancy expert and the history of current annual expenditures.

- *What arguments will you make to reduce future economic damages?* Life expectancy issues.

- *What collateral source rule applies in this jurisdiction?* Collateral benefits are not permissible as evidence at trial or as a verdict set-off. *How will that affect this case?*
- *Plan/strategy regarding applicability of ACA premiums to combat plaintiff's forecast of significant future economic damages?* Apparently certain bills were paid by insurance, others were paid out-of-pocket.

B. *Value of non-economic damages (list the recoverable categories and your best estimate of the most likely amount(s) to be awarded in the event of an adverse verdict).* Significant pain and suffering claim since while he is locked in, he is cognitively intact.

C. *If applicable, include any caps on damages*: N/A – Georgia's cap was abolished.

D. *If applicable, will punitive damages be an issue? Treble damages? Under what circumstances?* The only instance is if it is determined that someone lied in their note.

E. *Applicability of pre-judgment and/or post-judgment interest* – None at this time.

F. *Liens (Are there liens? If so, who are the lien holders and what are the amounts?)* – Unknown.

G. *Plaintiff's statement of monetary relief sought (if applicable)* – N/A

H. *Applicable mortality tables* –**See summary of Shavelle v. Fadia opinions.**

XI. Applicable rules regarding mediation/ADR

**Mediation set for 7/25.**

XII. Settlement Discussions - **$64 million demand made (global) with individual demand for policy limits and $54 million from the Hospital.**

- Amount of specific demand(s) if made:  See above.
- Amount of specific offer(s) if made:  None.
- Status of any known settlement discussions between plaintiff and any co-defendant(s):  None at this point.

XIII. Contribution/Indemnity (including any credits)

None of which we are aware at this time.

XIV. Current Assessment of Case

- *Percent chance for defense verdict for our insured(s):* 40%
- *Percent chance for defense verdict for co-defendant(s):*  See prior discussion and allocation.
- *Most likely adverse jury verdict range:* **$12 million -$15 million**
- Potential for verdict in excess of insureds' policy limit(s):  Yes although plaintiff will likely focus on the hospital and intensivists as the deeper pockets by arguing the Reptile theory (if a PA had not been in charge, and a physician was, then interventions would have been begun earlier). .
- Any other important issues:  There was a joint defense counsel meeting, but to date not everyone who can consent has done so. Subsequent discussion about putting forth an offer but that was before the $64 million demand.